CHESAPEAKE & POTOMAC TELEPHONE CO. OF BALTIMORE CITY v. WHITMAN et al., Public Service Commission of Maryland.

(District Court, D. Maryland. February 27, 1925.)

No. 727.

1. Evidence ⬅113(16)—Rule for determining value of commodity stated.

Usually law assumes that at any particular time a thing is worth what it will fetch in open market, and accepts quotations on exchanges as accurately determining its value, in absence of special circumstances; but where commodity is not dealt with on exchanges it must be valued at best price which owner, if willing to sell, but not compelled to do so, could obtain for it from buyer who wanted it, but could get along without it, as closely as this could be determined.

2. Evidence ⬅113(4)—Market prices of public utility's stocks and bonds held not accurate measure of value of its property.

Market prices of public utility's stocks and bonds is not accurate measure of value of its properties, since such prices are largely dependent on rate state permits corporation to charge.

3. Telegraphs and telephones ⬅33(1)—Method of determining rate base value.

Reproduction cost at certain date, plus cost of subsequent additions and working capital and going concern value, less depreciation, would generally be sound method of ascertaining value for rate base purposes.

4. Corporations ⬅151 — "Undivided profits" defined.

"Undivided profits" is amount of earnings which corporation might have distributed to its stockholders, but which was left in business.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Undivided Profits.]

5. Telegraphs and telephones ⬅33(1)—Evidence held to show value of property for rate purposes.

Evidence held to show that value of telephone company's property for rate-making purposes was amount invested therein, augmented by Public Service Commission's allowance for going concern value, in terms of present value of dollars.

**6. Telegraphs and telephones ⊚⟹33(1)—Evidence held to show depreciation of property.**

Evidence *held* to show physical depreciation of telephone company's property was at least of $4,500,000.

**7. Telegraphs and telephones ⊚⟹33(1)—Depreciation deductible from reproduction cost for rate purposes.**

Amount credited to depreciation reserve in excess of actual depreciation, though used to extend plant, should be deducted from reproduction cost in determining value for rate base purposes, where it was possible or probable that reserve might be required for purpose for which it was created.

**8. Telegraphs and telephones ⊚⟹33(1)—Stipulation held evidence of actual depreciation.**

Stipulation by Public Service Commission, in authorizing telephone company to accumulate depreciation reserve not to exceed 20 per cent. of its capital, that such reserve should not be included in capital for rate base purposes, concurred in by corporation, *held* strong evidence that depreciation not in excess of 20 per cent. was not more than average actual depreciation.

**9. Public service commissions ⊚⟹7 — Denying opportunity of adding to value of public utility property out of rates not confiscation.**

To deny to a public utility corporation opportunity of constantly adding to value of its property out of rates received from public is not confiscation.

**10. Telegraphs and telephones ⊚⟹33(1)—Return of 6 per cent. held not confiscatory.**

Six per cent. return on value of telephone company's property, which company was integral part of nation-wide system, and was assisted in its financing by corporation controlling it, *held* not confiscatory, but smaller rate would be confiscatory.

**11. Telegraphs and telephones ⊚⟹33(1)—Dealings between subsidiary and controlling corporation closely scrutinized.**

Where telephone company, which sought to enjoin enforcement of rates as confiscatory, was completely controlled by another corporation, dealings between them were open to close scrutiny by Public Service Commission.

**12. Telegraphs and telephones ⊚⟹33(1)—License contract between subsidiary and controlling corporation held valid.**

Contract between controlling corporation and subsidiary, under which subsidiary paid percentage of its gross revenues to controlling corporation in return for use of its patents, right to purchase supplies, etc., *held* binding, and could not be rejected by courts or Public Service Commissions, if made in good faith, and if company clearly showed that charges for services to subsidiary were reasonable, and less than that for which it could be obtained elsewhere.

**13. Telegraphs and telephones ⊚⟹33(1)—Agreement for division of tolls between subsidiary and controlling corporation held valid.**

Where agreement between subsidiary and controlling corporation, whereby tolls from interstate telephone business were divided between them, resulted in profit to subsidiary, courts and Public Service Commissions could not declare it invalid, unless subsidiary was charged more than services were worth to it, and profit to controlling corporation could not be considered.

**14. Public service commissions ⊚⟹23—Findings of Public Service Commission presumptively correct.**

Findings of the Public Service Commission are presumptively correct.

In Equity. Suit by the Chesapeake & Potomac Telephone Company of Baltimore City against Ezra B. Whitman and others, constituting the Public Service Commission of Maryland. Decree for plaintiff.

Bernard Carter & Sons, Piper, Carey & Hall, and Venable, Baetjer & Howard, all of Baltimore, Md., and Dozier A. De Vane, of Washington, D. C., for plaintiff.

Thos. H. Robinson, Atty. Gen. of Maryland, Edward H. Burke, Asst. Atty. Gen. of Maryland, Philip B. Perlman, City Sol., J. Wallace Bryan, Sol. for Commercial Telephone Subscribers Ass'n, William M. Maloy, Sp. Counsel for Public Service Commission, and Clarence W. Miles, People's Counsel, all of Baltimore, Md., for defendants.

Before ROSE, Circuit Judge, and GRONER and SOPER, District Judges.

ROSE, Circuit Judge. The plaintiff in this cause is the Chesapeake & Potomac Telephone Company of Baltimore City, a Maryland corporation. Whenever there is occasion to distinguish it from any other body corporate, it will be referred to as the Maryland Company, and when there is not, it will be more briefly styled the Company. It supplies telephone service throughout the state. In June, 1924, it wished to raise its charges. As required by law, it published its proposed schedules of rates and filed copies of them with the Public Service Commission of Maryland, herein called the Commission. The changes it contemplated would have increased by over $1,100,000, or by about one-eighth, the total cost to the public of services identical with those rendered by it in 1923.

At the instance of the Commission, and for the purpose of giving the latter time to inquire into the reasonableness of the new rates, the Company postponed the date at which they would be put into effect until November 1, 1924. The hearings before the Commission began on the 22d of September. When the 1st of November arrived they had not been concluded, and at the ur-

gent request of the Governor of the state the Company substituted January 1, 1925, for November 1, 1924, as the day upon which it purposed to put in force the new and higher charges.

The hearings before the Commission continued until December 22, 1924. One week later it announced its conclusions. It embodied them in an elaborate opinion and order, which refused the increase asked for and continued the previously existing rates in force for two years from January 1, 1925, until December 31, 1926, both dates inclusive, unless within that time the Commission should otherwise direct.

The Company began this suit on December 31st, two days after the order was entered. In its bill of complaint it says that under the rates the Commission requires it to maintain it cannot get a fair return upon the fair and reasonable value of its property exclusively devoted to furnishing intrastate telephone service in Maryland. It prays that the order imposing such rates upon it shall be declared void, the Commission enjoined during the litigation, as well as permanently, from attempting to compel it to keep them in force, and in like manner restrained pending the hearing of the application for an interlocutory injunction.

Judge Soper who was asked to issue the temporary restraining order, at once conferred with the Attorney General of the state and with the other counsel on both sides of the case. He concluded that there was small occasion for such a stay, as the motion for a preliminary injunction could be set for hearing within a week from the filing of the bill. Such dispatch was, under the circumstances, both possible and desirable. Both parties were then full of the case. The trial before the Commission had extended over 3 months, 49 days of which had been occupied in public hearings. They ended only 16 days before the date upon which they began again in this court. The witnesses required by either party to sustain its position on the important issues involved were accessible in at least as large a proportion as they were ever likely to be again.

The members of the court knew how unsatisfactory affidavit evidence usually is. At their instance and with the cordial concurrence of all the counsel engaged, the witnesses were examined and cross-examined in open court. We are indebted to our professional brethren appearing in the case for their hearty, able, and effective co-operation with us and with each other in expedit-ing the proceedings, and for the skill with which in the examination of the witnesses, speed, and thoroughness were successfully combined. The hearing before us occupied some 8 days, of rather more than normal length. We regret that the inescapable pressure of other judicial duties has made it necessary for us to keep the case under consideration for a longer time than would have been otherwise required, even after all due allowance is made for the importance and difficulty of many of the questions involved.

## The Controverted Questions.

At the hearing, every one agreed that the Company was entitled to a fair return upon the actual present value of its property employed in the service of its patrons, for as the Supreme Court has said: "Rates which are not sufficient to yield a reasonable return *on the value of the property used at the time it is being used to render the service* are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment." (The italics are ours.) Bluefield Waterworks v. Public Service Commission, 262 U, S. 679, 690, 43 S. Ct. 675, 678 (67 L. Ed. 1176).

As usual, however, in rate cases, there was wide difference of opinion, both as to what that value is and as to the relative accuracy of the several conceivable ways of ascertaining it. There were, moreover, two other questions as to which the parties were in conflict. One of them was as to whether certain payments made by the Company to other corporations should be charged, as the Company claimed, to expenses, or were, as the Commission held, a part of the net earnings. The other matter in dispute was the minimum percentage of return to which the Company was lawfully entitled. These questions will be considered in the reverse order in which they have been stated.

## Present Value of Company's Property— Market Value.

[1] Usually the law assumes that, at any particular time, a thing is worth what it will then fetch in the open market. Some commodities are habitually dealt with on exchanges, which keep a record of what is sold on them and of the prices realized. As a rule, the law for its purposes will accept such quotations as accurately determining what the commodity was worth on any particular day, although doubtless it

sometimes may be permissible to show the existence of peculiar conditions which would make the ordinary assumption untrue and unjust. Other articles are subjects of almost daily purchase and sale, but the transactions in them are matters of private bargaining, and the prices paid at the same time by different people may vary considerably. In such cases the trier of fact may not find it quite so easy to determine what, at any particular time, may have been the precise actual worth of a unit of the commodity involved in the controversy, but the margin of possible uncertainty is usually relatively small. Then, again, the property, the value of which is to be ascertained, may have peculiarities of its own, as is usually the case with land.

Court or jury may have not a little difficulty in determining from conflicting testimony what the real market value is; but the law says they must come as near as they can to valuing the land at the best price which its owner, if willing to sell, but not compelled to do so, could obtain for it from a buyer who wanted it, but who could get along very well without it. It is doubtless easier to state the rule than it is to apply it, by putting oneself in the position of such purely imaginary buyers and sellers; but on the whole, in practice, it has worked fairly well. In the nature of things, there can be seldom anything like a free market for a public utility. Except in the case of some comparatively small properties, possible purchasers are few, and probable ones perhaps nonexistent. This was true, even before the days of public regulation and limitation of rates.

## Market Value of Securities.

[2] In that earlier time the prices commanded in the market by the stocks and bonds of such a corporation might be a fairly accurate measure of the then value of its properties. Nowadays what a public utility's securities will sell for may be largely, if not altogether, dependent upon what rate the state will permit it to charge, and in consequence may have small relation to the actual worth of its property used in the public service. In the instant case the great bulk of the Company's securities have never been bought or sold in any genuine sense of that term. Its entire common capital stock was apparently originally subscribed for by the corporation which still holds it. The only securities it appears ever to have issued to the public were some $3,000,000 of 7 per cent. preferred stock,

put out at par some years ago and now selling on the exchanges at a premium of about 11 per cent. In the case before us, no evidence has been offered to prove what its property, or the securities by which it is represented, would fetch, if put up for sale.

## Reproduction Cost.

Another way of ascertaining what is the present fair value of what is used is to show what would be the cost of reproducing so much of it as is really used and is useful. The Company supplies something the public wants. If by a catastrophe, or series of catastrophes, all that it has was either wiped out of existence or made altogether useless for its present purpose, the people of the state would be deprived of all telephone facilities. The demand that they should be replaced would be general and insistent. To meet it, a new plant would be required. The cost of reconstructing it would furnish evidence of the present value of the Company's property, both to it and to the public. The reproduction cost would, of course, exceed the present value by whatever difference there is between that which is altogether new and that which is in varying degree now old. The theoretical objections to this method of arriving at the present worth of the property of a public utility are probably less formidable than are those which develop themselves whenever an attempt is made to use it. At one time or another, almost everybody has advocated it. A decade ago, it was the favorite of legislative bodies, Public Service Commissions, and others who in official position or in private station sought to protect the public against excessive charges.

In 1916, as the outcome of an inquiry extending over some years, the Commission valued the Company's property as of June 30, 1914. Before doing so, it had gone into a minute and painstaking investigation of the cost of reproducing anew what the Company then had. In those pre-war days, the Company did not think that such a way of ascertaining the amount upon which it was entitled to a return was fair. The Commission seems to have felt the Company was right to a degree at least, and it therefore did not accept the reproduction figures as conclusive. It added to them certain allowances for what it called intangible values, representing in part the money the Company had necessarily expended in building up its business, and which was not included in the cost of acquiring its physical

possessions. Nevertheless, it is fair to say that the Commission gave great weight to the result of the inquiry into the reproduction cost. In a very substantial sense its finding of value was in large part based upon it, modified, it is true, by certain additions and subtractions dictated by its sense of fairness, or, as it thought, required by the application of everyday common sense and business experience to the necessarily somewhat theoretical conclusions of the experts.

Under the circumstances in which it found itself at the time, it could scarcely have done otherwise. Before the days of public regulation of the charges of utilities, there was no compelling reason why their books should be so kept as to preserve and disclose the information needed by rate-making bodies. The Commission learned that to ascertain the cost of reproducing such properties as those of the Company required the services of engineers of great experience and technical training in highly specialized branches of their profession. The work was troublesome and costly. It could not be repeated frequently. When the Commission fixed the fair value of the Company's property as of June 30, 1914, it supposed that many decades would elapse before it would be again necessary to inquire into the cost of reproducing the Company's property.

### Value in 1914.

The value then ascertained was $12,922,-458, of which, however, $1,367,700 represented the investment in the plant of a depreciation reserve, taken for that purpose out of the rates paid by the public. The Commission held that it was only upon the balance the Company could ask for a return, that is upon $11,554,758.[1]

---

[1] The Commission in its 1916 finding (case 690 on its docket) did not make a total of the two figures above stated, but both sides agree that what is above said is an accurate statement of what the Commission intended to do, and what, in fact, it did. It reached its results by making various additions to the figures appearing upon the books of the Company and various subtractions from them. The sums so added and subtracted were, in the nature of the case, nothing more than approximations, more or less close, and were, in that sense, arbitrary, and, if any one pleases so to think, illogical. They were then, however, accepted by both parties as doing substantial justice, and are so accepted today. Unfortunately, the Commission did not require the Company to adjust its book entries to those proceedings, with the result that at the hearing before us some unnecessary confusion resulted. This note is made, in order that subsequent inquirers may not be perplexed.

Since June 30, 1914, the Company, as required by the Commission, has periodically reported the cost value of the retirements of its property worn out, or which has become obsolete, and also the cost of new additions, so that the books of the Company and the Commission now show the cost in dollars of the net additions since made to the Company's possessions.[2]

Books so kept would show the cost of the Company's property at any particular time. In the absence of great changes in values, such cost, due allowance being made for depreciation, would be a fairly accurate measure of present value.

### Depreciation Reserve.

The Company's reports to the Commission always show something carried to the credit of depreciation reserve. It has been built up of sums taken out of revenue. It is charged with the actual or with the approximated original cost of property retired from service. It is used in plant extensions, while awaiting the time it may be needed for replacements, instead of being kept in cash or invested in outside enterprises. The Commission in 1916 expressly said it should form no part of the property upon which the Company would be entitled to a return.

### Book Costs and Depreciation Reserve.

Throughout this opinion, we shall, except where it is otherwise stated, follow the example of the Commission, by bringing down our figures to December 31, 1923, and there stopping. If to the $12,922,458, the value of the Company's property on June 30, 1914, as found by the Commission, there be added $15,931,443, the aggregate excess since that date of additions over retirements, the total will be $28,853,901.

---

[2] When one of a number of like items goes out of service, it is not always easy for the Company to ascertain what was paid for it, perhaps many years before. Its books do show how many such things it has, and what all of them cost in the aggregate. In recent years, in making its reports of retirements, with the consent of the Commission, it has assumed that the particular article retired originally cost what was at the time of the retirement the average cost of all the items of its kind. This assumption will not always be true, and as, since 1914, prices have fluctuated greatly, it will often be very far from the truth. So far as we can see, the possible or probable inaccuracy resulting is of practical importance only in so far as it indicates that the property retired cost more than it did, and that as a result the apparent net additions to the Company's holdings were less than is in fact the case.

The net additions to depreciation reserve in the same 9 years and 6 months were $4,655,154, and at the end of the period the total amount to the credit of that fund was $6,022,854. In other words, if nothing had happened to render inapplicable the assumption made by the Commission in 1916, the Company on December 31, 1923, would have been entitled to a fair return upon at least $22,831,047; that is to say, upon the difference between the $28,853,901, the cost of its property, and the $6,022,854 then to the credit of its depreciation reserve. The Commission in the instant case has, however found that the Company needs a working capital of $975,000, a sum $475,000 greater than was allowed for that purpose in 1914, increasing thereby to $23,306,047 the amount upon which in accordance with the assumption in question the Company may of right demand a return.

### The Commission's Valuation.

[3] In reaching the conclusion in controversy in this case, the Commission as at present constituted calculated the December 31, 1923, value of the Company's property in another way, and by so doing fixed it at $24,350,944, or more than $1,000,000 in excess of the amount which would have resulted from a rigid application of the methods seemingly contemplated by it in 1916. In reaching this total of $24,350,945, the Commission started with $13,062,197, the sum originally ascertained to have been on June 30, 1914, the cost value new of the Company's tangible property. To this it added for net additions since, not the $15,931,443 shown on the face of the books, but only $15,276,483, and thereby arrived at a cost new on December 31, 1923, of $28,338,680.

The propriety of so reducing the apparent value of net additions to the Company's property was not made clear to us. However, the Commission did so reduce it, and as a consequence fixed the cost of the Company's tangible property to December 31, 1923, at $28,338,680, a figure which, but for the deduction mentioned, would have been $28,993,640. From what it found to be the cost of the Company's property to the date in question, the Commission deducted for depreciation, not the $6,022,854 then standing to the credit of depreciation reserve, but what was in some sense, at least, the arbitrary amount of $5,667,736, or 20 per cent. of such cost. In this way it arrived at the sum of $22,670,944 as the actual value of the Company's tangible property. To this

it added $975,000 for working capital, and $705,000 as the worth of the Company's intangible property; that is to say, "going concern value," "cost of attaching business," or whatever other title you may choose to give to it. The total, $24,350,944, is the amount upon which the Commission says the Company is entitled to a fair return.

The deduction which can properly be made for depreciation is one of the sharply controverted issues to be later considered. With the exception already noted, we think the Commission used what would have been, in most periods of the world's history, a sound method of ascertaining the actual value upon which the Company was entitled to a return. These modifications will raise the Commission's figures of the value of the Company's property to $30,673,640 before any deduction for depreciation has been made, and upon the assumption that during the preceding decade the purchasing power of the dollar was stable.

### The Investment.

[4] The amount invested in the Company's property and business should throw some light on the problem with which we are now concerned. The Company's books show that on the 31st of December, 1923, the total investment was $29,078,014, figuring, as we have heretofore done, the balance then credited to the depreciation reserve account at $6,022,854. In this total are included, as for the purposes now in hand should be done, all sums received from the sale of stock, common or preferred, money borrowed, undivided profits, and depreciation reserve. The undivided profits were, in comparison with the size of the Company, small, amounting to $1,044,592. In the 9 years and 6 months from June 30, 1914, they increased only $377,076. They are, of course, the aggregate of the earnings which the Company might have distributed to its stockholders, but which it did not, preferring to use them in its business.

It will be noted that the total investment is $1,595,620 less than the amount of the Commission's valuation as modified by us. The difference is principally to be found in the fact that the total investment on the Company's books in 1914 was but $12,727,528, while the Commission then and now found, including working capital and intangible values, the property was at that time worth new $14,267,197. It appears the amount invested on December 31, 1923,

was $16,350,486 larger than it had been on June 30, 1914. The net additions to the plant during that time cost $15,931,443. The difference between the increase in the investment and the net additions to the tangible property of the Company doubtless is due largely or altogether to the greater amount of working capital now in use.

### The Purchasing Power of the Dollar.

[5] In normal times it is highly probable that either the method apparently contemplated by the Commission in 1916 or that actually followed by it in 1924 would in practice have yielded results at least as accurate as those which could be arrived at by an expert study of the cost of reproduction, and at far less expenditure of time and money; but, as every one knows, times have been very much out of joint. The fluctuations in the prices of both labor and materials during the period in question have been so out of the ordinary that the cost of property in 1914, or, for that matter, in 1919 or 1920, are certain to be very different on one side or the other from the actual value of the property in 1923, or at the present time.

It is not probable that the Commission lost sight of these conditions, but it seems to have felt that under the peculiar circumstances of this case it was not as a practical matter necessary to make any substantial allowance for them. It apparently reached this conclusion because it thought the Company had bought or built more of its property during times of high prices than of low. Through one of its accountants it submitted to us an estimate, to be presently analyzed, that only about $6,500,000 of the Company's property now in use had been in existence before January 1, 1916, that is to say, in pre-inflation days, while $9,000,000 have been acquired in the four years from 1917 to 1920, both inclusive, in every one of which prices were materially higher than they now are.

If the property acquired before January 1, 1916, is in dollars of to-day worth more than it cost, the reverse is true, although to a less extent, as to that bought or built from the beginning of 1917 to the end of 1920. The Commission seems to have assumed that one of these price movements offsets the other, so that the present value of the Company's property does not differ greatly from its original book cost, proper allowance being made for depreciation, and that whatever margin of error there may be in such an assumption is far less than would result if any considerable weight was given to what the Commission says is the "fantastic character" of some of the Company's evidence as to reproduction cost. In this connection its counsel confidently rely upon Georgia Railway v. Railroad Commission, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

On the other hand, the Company says that the estimates made by its experts of the cost of reproducing its tangible property do not exceed by much, if at all, the aggregate it actually expended for that property, when due allowance is made for the fluctuating values of the dollar. Before attempting any analysis of the evidence on the subject of reproduction, it would be well to inquire whether the testimony justifies the assumption of the Commission that, in spite of the ups and downs in the purchasing power of the dollar, or perhaps more properly because there have been ups and downs, the book value of the Company's property represents its real present worth as nearly as that is capable of ascertainment.

### The Calculations of Mr. Collins.

In this court, the Commission had one of its accountants, a Mr. Collins, make a calculation which purported to show that the cost of the Company's property, expressed in terms of dollars of 1923, was but $1,600,000 more than the figures at which it stands upon the Company's books. To determine the comparative value of the dollar during all of any one year, Mr. Collins used the Department of Labor's index figures for the average for the entire year of the prices of all commodities. He then calculated what percentage that average was of the similar figures for December, 1923. By applying the percentage for any particular year to the book cost of property acquired by the Company during that year, he arrived at the present reproduction worth of that property in terms of dollars of 1923. As, for example, an item which in 1914 was carried on the books at $1 would be worth $1.54 in the shrunken medium of exchange of December, 1923, while something which cost $1 in 1920 could, at the end of 1923, be reproduced for 67 cents.

Obviously, when prices go up as rapidly as they did from 1917 to the middle of 1920, or fall as fast as they did from the latter part of 1920 through most of 1921, the use of average index figures for an entire year may lead to a very inaccurate conclusion as to the money cost of something

built or bought at any particular time of that year. Mr. Collins, who impressed us, not only as a very intelligent witness, but a candid one as well, admitted that his method was simple almost to the point of crudeness, and that at the best it could yield results which would be nothing more than rough approximations; but, even so, he thought they were on the whole likely to be as near the truth, or nearer, than any which had been obtained by the much more elaborate calculations made by the Company's accountant, Mr. Gretz, about which we will later have something more to say.

Reserving, therefore, for the moment, the consideration of whether Mr. Collins is or is not right as to the comparative accuracy obtainable by his methods as contrasted with others, it would be well to inquire whether he is justified in the assumptions he makes as to the dates at which the Company acquired the property it still uses.

### When Retirements were Made.

If all the property it now has had been obtained before January 1, 1916, its cost expressed in terms of dollars of 1923 according to the indices used by him would be about 52 per cent. greater than that shown on the face of the Company's books. On the other hand, had all of it been procured during the four years from January, 1917, to December 31, 1920, it would be worth to-day not quite three-fourths of the price the Company actually paid for it.

Before attempting to test the accuracy of the dates at which he assumes the retirements to have been made, it is necessary to point out that he is seemingly in error in the figures with which his study starts. They are $12,468,250, which are those of the book cost on December 31, 1914, of the tangible property then owned by the Company. The Commission had, however, determined that the real reproduction cost new was at that time $13,458,411; that is to say, on June 30, 1914, it was $13,062,-197, to which the net additions in the succeeding 6 months were $396,214, and in the instant case the Commission, in its ascertainment of present value, uses the same figures. They exceed by $990,161 those employed by Mr. Collins. If this correction be made, the book cost on December 31, 1923, would be $28,993,640, as has been already stated in another connection.

Mr. Collins assumes that all the retirements made since December 31, 1914, were of property owned by the Company in that year. He does not claim that the assumption is true, but he testified that he thought it was the only one he could make under the discoverable facts and the rules and practices of the Commission. He explained that the report made by the Company of its retirements did not identify the particular articles taken out of service in such a way as to show when they had been built or otherwise procured, and that therefore the presumption was that the retirements were made from the property longest in service. Now it is true that, when a telephone pole is blown down or has rotted or has become unsafe, or has been moved because it is not strong enough for the increased cables to be strung on it, the Company's records and reports do not identify it by number or location; but they do show that the thing retired was a pole, and not a telephone instrument, or 100 yards of wire, and the report does state what price the Company had put upon that pole in reaching the total value of its retirements.

The Company has 30 or more independent property accounts, and everything retired is identified by being entered in one or the other of these. The character of these accounts may be illustrated by the names of some of them, such as "Exchange Right of Way," "Buildings," "Central Telephone Office Equipment," "Toll Pole Lines," etc. From these records, quite accessible to the Commission, and indeed in its possession for months before Mr. Collins testified, it is easy to demonstrate that the Company, on December 31, 1923, still had in use very much more of the property possessed by it on December 31, 1914, than Mr. Collins has assumed.

We have been at some pains personally to make these calculations. There are some 18 property accounts, in which the aggregate retirements between the two dates was less than the amount of property in those accounts in 1914. From them it is easy to demonstrate that, of the property in use on December 31, 1914, at least $8,514,144 at its 1914 cost value was still in use on the 31st of December, 1923. Unquestionably there was more, even in these 18 accounts, as it is certain there must have been some articles carried in them which were renewed more than once in the 9 years. By no possibility could there have been less. Mr. Collins, by assuming that all the retirements since 1914 were of property then owned by the Company, reached the conclusion that only $5,309,782 in value of the things in

service at the end of 1914 were in use at the close of 1923. We have carried our studies of the Company's property account as put in evidence by the Commission far enough to establish that Mr. Collins' figures of the total cost of the Company's property in use on December 31, 1923, when expressed in dollars of that year, should have been at least $32,259,575, instead of $29,605,431, as stated by him. The index figures we have used are those employed by him. Indeed, our calculations are made precisely as his were, except that we have availed ourselves of whatever clear light the Company's accounts in evidence furnish as to the times when the retirements were made. The total stated is the minimum result justified by his index figures.

There can be no doubt that, if the precise life of every article now used and owned by the Company could be ascertained, the, above total would be increased to an appreciable extent. The only uncertainty is how great this increase would be.

To this $32,259,575 must be added the sum of $975,000, which the Commission finds to be the sum used by the Company as working capital. Moreover, the Commission held that the value in 1914 of the Company's intangible property in dollars of that year was $705,000, which, brought up by the use of the index figures employed by Mr. Collins, is equivalent to $1,085,700 in 1923. The addition of these two sums give a total of $34,320,275 investment in dollars of 1923.

### Analysis of Accounts of Net Additions.

We have checked the figures named by analysis of the net additions from time to time made to the Company's tangible property, as those additions appear on the Company's books in dollars of the period at which they were made. The result is apparently to show that, in dollars of 1923, such portions of the Company's property cost $35,178,640, which, with the additions for working capital and for intangible values, the latter also expressed, not in dollars of 1914, but in those of 9 years later, gives a total new value of $37,239,340.

### Analysis of Amounts Invested.

We have, moreover, examined with care the moneys from time to time invested in the Company's business. Our data have been taken from the Company's balance sheets, and not from its so-called investment accounts, as the former, and not the latter, give the information needed in this connection. On June 30, 1914, its balance sheet showed a total investment of $12,727,528. It has grown year by year since, but at quite varying speeds. By the use of the index figures which the witnesses on both sides substantially accept, we have reduced the amount of those additions to investment to the values of dollars of 1923, with the result that the total net investment on December 31, 1923, as expressed in the then contemporary dollar, was $35,037,212, to which should be added for intangible value $1,085,700 in dollars of the same time. The total is $36,122,912. These figures exceed by only $1,802,637 those which the analysis of the calculation of Mr. Collins demonstrated to be the minimum of present cost new of the Company's property expressed in dollars of 1923. On the other hand, they are $1,-116,428 less than are those which result from the study of the cost of the net additions to the Company's tangible property, when and as those additions were made.

It may be said that the accounts do not sustain the contention of the Commission that the additions during the high-price period offset or nearly offset those made during the era of low costs. The property acquired before 1917 is now worth, upon the assumption of the accuracy of the index figures and of the way in which they have been used, almost $7,300,000 more than it cost the Company, while that procured from January 1, 1917, to December 31, 1920, is now newly worth $1,650,000 less than was originally paid for it. The truth, of course, is that the original cost of the property bought before 1917 was in round numbers $15,000,000 and that acquired from 1917 to 1920, inclusive, was less than $6,500,000. In the years 1921, 1922, and 1923, an aggregate of $7,600,000 was added, and it cost nearly $100,000 less than it would now.

In other words, according to this method of calculation, the depreciation in the value of the dollar has made the Company's property now worth, in terms of dollars, almost $5,750,000 more than it cost.

### The Purchasing Power of the Dollar.

The Company on its part went into an elaborate inquiry as to the effect of the great fall in the purchasing price of the monetary unit and the consequent rise in prices upon present-day values expressed in dollars, and it undertook to show that in all probability the level now reached was likely to be permanent, or at all events to continue for an indefinite period. It put on the stand the eminent economist, Dr. Hollander, of the Johns Hopkins University, who gave per-

suasive and uncontradicted testimony to that effect. He accepted the index figures of the Department of Labor, used by Mr. Collins, as being on the whole a fair measure of the value of the dollar. He also testified that for two years those figures indicated that its value had been stable, and he gave strong reasons why, in his opinion, that stability was likely to continue for a number of years to come, although, with scientific caution, he did not commit himself to any prophecy on the subject.

As has already been said, no attempt was made to contradict this testimony or to weaken its force. It is so much in common with the conclusion of all observing men that we feel constrained to accept it, and consequently to put aside the suggestion that speedy return to anything like pre-war prices is at all probable. During the closing months of 1920, throughout 1921, and for some time thereafter, it seemed probable that there might be such a recession, Commissions and courts were then reluctant to give much weight to evidence of reproduction costs, calculated, as they necessarily were, upon prices which might be of the moment only.

### Mr. Gretz's Calculations.

The Company attempted to show what its present property had cost in dollars of 1923. To that end its highly competent accountant, Mr. Gretz, submitted the result of a laborious study he had made of the actual cost to it of the new additions made to its property since 1914, and then undertook to give their equivalent in dollars of 1923. He reached the conclusion that, in such dollars, the property of the Company had cost it $36,106,848, exclusive of any allowance for working capital or for going concern value, or, adding the same sums we have heretofore allowed for those items, $38,167,548. That is about $4,000,000 more than is shown by the figures of Mr. Collins, even with our corrections. The total of Mr. Collins is, of course, only a minimum, and part of the difference between it and that of Mr. Gretz may plausibly be attributed to two causes: First, the books do not furnish data sufficient fully to correct Mr. Collins' assumptions as to the date of retirements; second, the use by him of an annual average index figure may, in a period of rapidly advancing prices, have made the total cost in dollars of 1923 appear to be less than it was.

Mr. Gretz's tables and charts indicate that, in point of fact, the upward movement of the open markets from 1917 to 1920 was more rapid than was the rise in the cost of the actual work done by the Company. Moreover, the rise in the price of commodities was not uniform, either in point of time or in extent. It is possible that the assumption by Mr. Collins that they were tended to make the cost in 1923 dollars appear to be less than was the case. Mr. Gretz's calculations were painstaking. They appear to have been skillfully made. Very probably they were actually as well as theoretically correct, in so far as it was possible for him to use ascertained figures, and not to average, assume, or guess; but that was seldom the case. In arriving at them, he had as a rule to make some more or less arbitrary assumptions, and he was compelled to exercise an appreciable measure of judgment and discretion. Doubtless he wished to be fair in all he did, but nevertheless he held a brief for his Company, and he would have been more than human, had he not been subconsciously influenced by that fact. Certain it is that no explanation has been given of the wide margin between his results and those clearly indicated by the sum actually invested in the Company's business.

### Cost of Reproduction.

The Company sought to support his conclusions in another way. It says they are confirmed by the elaborate testimony it has offered as to the cost of presently reproducing its property. But are they? As we shall presently see, the Company had Mr. Robinson, its chief engineer, carefully estimate what it would cost to reproduce new its physical property. Omitting from his tables the figures for right of way, land, buildings, and interest during the course of construction, there remains a total of allocated costs of $27,784,817, to which he adds about 10.2 per cent. for omissions and contingencies, engineering, administrative and legal costs, taxes, and insurance, and thereby brings up his aggregate to $30,618,932. Mr. Gretz says that these same properties actually cost the Company, in dollars of 1923, $32,747,028, or almost exactly $2,000,000 more than the sum for which Mr. Robinson testifies they could now be reproduced.

### How the Revaluation was Made.

Before considering the testimony as to the cost of reproduction, a word should be said as to the circumstances under which the appraisement was made. The Commission had not been asked to revalue the Company's property, nor had it ordered such a revaluation. No representative of it took any part in calculating the reproduction cost or value.

No notice appears to have been given the Commission that any such revaluation was to be made. It is true that, if one may judge from intimations in the opinion of the Commission in this case, it is not likely that it would have sanctioned one, had it been requested to do so. The fact remains that it was not asked, and the results of that made by the Company are accordingly open to much the same criticism to which admiralty subjects ex parte surveys at which interested parties have had no opportunity to be represented. On the other hand, it is, of course, true that the Company could not reasonably have based a request for an increase of rates upon a claim that its property was worth very much more than was shown on its books, without first having made a very careful study of the present value of its holdings.

### Land and Buildings.

How did the Company go about ascertaining the present reproduction value of its property? In the first place, it asked the Real Estate Exchange of Baltimore City to nominate three of its members, believed by it to be especially expert in ascertaining land values. The three gentlemen named were employed by the Company to inspect and value each piece of land owned by it. They did so, and the results were laid before the Commission and subsequently before us. Each of them were men of exceptional standing, of long experience, and of high competency, at least as to the value of real property in Baltimore City. They were qualified to testify as experts to the worth of lands in other parts of the state. They gave, lot by lot, their estimate of the present value of the Company's land, apart from the improvements upon it.

The Company employed three practical builders and contractors, with unusual experience in the actual erection of large and important structures, to examine the buildings owned by it, and to report their conclusion as to what it would cost to reproduce the structures in question. Two of them concurred in the estimate of the deductions which should be made for depreciation, while the third thought that the buildings were so well maintained that, for the purpose to which they were put, they were as good as new.

### Valuation of Other Property.

The valuation of the rest of the Company's property was made independently by two persons. The first of these was Mr. William F. Sloan, a consulting electrical engineer, specializing almost exclusively in telephone construction and maintenance. He appeared to be a highly competent man. He testified as to the cost of reproducing the Company's plant, supposing the materials needed were bought in the open market and at prices charged companies or individuals who were not entitled to buy from the Western Electric Company at the special rates given by it to what are called the associated companies of the Bell System, about which we shall have something more to say.

The second was Mr. Charles A. Robinson, the chief engineer of the Maryland Company, and of the Virginia, West Virginia, and District of Columbia companies, cooperating with it in what is known as the Chesapeake & Potomac group of the associated companies. He gave the results of the calculations he had made as to what it would cost to reproduce the Company's property, if those charged with the work of reconstruction could obtain the articles supplied by the Western Electric Company, at the prices at which it sold them to the associated companies. Messrs. Robinson and Sloan each accepted without further inquiry the estimate of the real estate experts and of the builders as to the value of the land and the reproduction cost of the buildings with the depreciation thereon, and included those figures in their estimates. The result was that Mr. Sloan reached a total reproduction cost of $47,283,275. Mr. Robinson fixed it at $42,829,008. It is certain that all the money which ever went into the property of the Company did not, even when reduced to the terms of dollars of 1923, exceed, as already figured, $35,037,212, to which, for comparison, the Commission's allowance for intangibles should be added, bringing up the aggregate to $36,122,912. Mr. Sloan made an allowance of $4,397,165 for depreciation, and concluded that, upon the reproduction theory, the property of the Company was presently worth $42,841,110. Mr. Robinson's deductions for depreciation amounted to $4,513,855, so that he put the present value at $38,315,153.

The present value, less depreciation, arrived at by these gentlemen, of $42,841,110 and $38,315,153, is comparable with the $29,507,949 which, as will be subsequently shown, is the difference between what the Company has invested in its present property, expressing that investment in dollars of to-day, and the sum in like dollars now standing to the credit of its depreciation reserve; that is to say, Mr. Sloan's reproduction cost exceeds all the money in post bel-

lum dollars that has gone into the property, whether from depreciation reserve or from any other source whatever, plus, moreover, an allowance for intangibles, by 31 per cent., and Mr. Robinson's by 18 per cent. Their estimates of the present depreciated value of the property exceed the money put into it otherwise than from depreciation reserve by 45 per cent. and 30 per cent., respectively. It is quite natural that the Commission was not eager to accept these figures as accurate estimates of real value.

### Cost of Establishing Business.

It is possible to lay a finger on some of the great differences between the Company's experience and the experts' opinions. Each of them takes into account what one of them calls "cost of establishing business" and the other, "going value." Their estimates on this score are many times as great as any amount which the Company expended for that purpose. The Company in 1914 was some 30 years old. It had long before incurred and paid all of the charges for bringing it into the world and for nursing it through infancy, childhood, and adolescence to the full stature of manhood. At that time the Commission allowed it $705,000, to make good what its nurture and education had cost. Apparently it was then quite contented with what had been done. Since then, every dollar that has been used for extension purposes has been treated as an ordinary current expense, and so charged against rates. Mr. Sloan's estimate of the value of this item is $5,388,575, and Mr. Robinson's $4,324,424. Even upon the justifiable assumption that the $705,000 allowed by the Commission in 1914 is equivalent to-day to almost $1,100,000, Mr. Sloan's estimate is nearly four times as great and Mr. Robinson's nearly three times.

### Interest During Construction.

Each also figures a very considerable sum for interest during construction; Mr. Sloan's figure being $1,556,323, and Mr. Robinson's $2,000,957. The Company's net additions to its plant since 1914 have exceeded the entire value of the property in that year, and, even if all allowance be made for increased cost, the construction since must have nearly equaled the worth of all that it then had. The actual cost to the Company of interest during construction has been, according to the figures furnished by Mr. Gretz, the Company's chief accountant, $173,125.61. A very large part of the new work which the Company has undertaken since 1914 was executed when the current rates for interest on loans were at least as high as they now are.

### Administrative and Engineering Costs.

Mr. Sloan estimates the general administrative and engineering costs of reproduction at $2,994,268, and Mr. Robinson at $2,227,968. It is not possible from any of the exhibits in evidence to compare these figures with the actual expenditures by the Company for the purpose in question. The totals of Mr. Gretz's calculations, already discussed, suggest that perhaps those of Mr. Robinson are not unreasonable, and yet the Commission may have felt some doubt as to whether they were not rather high.

### Land and Buildings.

Neither Mr. Sloan nor Mr. Robinson were responsible for the valuations of lands and buildings adopted by them. They took them from the report of the real estate and building experts who appraised the Company's real estate and improvements. As to the prices put upon a portion of them, the Commission was in a position to introduce some testimony on its own behalf, and to cross-examine much more closely the Company's witnesses than in the nature of things it was able to do as to the cost of telephone material and installation, intimate knowledge as to which is possessed by few not in the employ of the Company or of its associates. From conflicting evidence we have concluded that the value put by the Company upon its land is too high. It is not, by any means, grossly excessive, but in the aggregate it is, perhaps, about one-eighth above the present real worth of the property.

We are satisfied that the figures for the buildings err in the same direction and to a still greater extent. To go into a minute analysis of the testimony which has led us to this conclusion would lengthen our opinion overmuch. What was told us as to the cost of reproducing the Company's buildings clearly and forcibly illustrates the almost inescapable difficulties in the way of arriving in that way at an accurate present valuation of properties widely scattered and greatly differing in their characteristics. We were furnished with elaborate and detailed estimates as to the cost of reproducing buildings never originally designed for the use of a telephone company, and which, for such purposes, no human being would ever think of reproducing. In these matters the Company's witnesses, doubtless in order to escape a suggestion that they had used one

method as to one building and a different method as to another, included in their calculations as to what would be the outlay for rebuilding a rural cottage in which the Company happened at present to have a village exchange, the wages of timekeepers and watchmen, and the expenses of providing temporary offices and accommodations for clerks and workmen, doubtless required when buildings costing hundreds of thousands of dollars are in course of construction, but which certainly would not be needed to put up a simple frame building in a small country town.

The evidence, moreover, convinced us that there was, in the making of these estimates, a tendency, doubtless unconscious, to assume that, because the character of some of the appliances, fixtures, or construction was in one or more of the buildings high, that the same measure of costliness could properly be applied to all. As, for example, it was assumed that the average reproduction price of some hundreds of electrical fixtures installed in a particular building was $22.50, because some of them new were worth that figure or more. We think it established that the cost of replacing all of them would not have exceeded on the average $7 apiece. We cannot say that the Commission was wrong in holding that they could not accept the Company's reproduction evidence as conclusive of the value of the buildings, or even highly persuasive within some hundreds of thousands of dollars.

## Weight to be Given to Testimony of Sloan and Robinson.

From what has already been stated, the Commission would have been justified, we think, in concluding that the estimates of Messrs. Sloan and Robinson in such matters as were susceptible of effective check by the Commission were millions too high. This excess is due to their having made certain theoretical assumptions, which neither the Commission nor this court is able to accept. Those portions of their estimates which dealt with the actual present-day cost of the purchase and installation of telephone equipment or apparatus proper are doubtless open to less question. We are, however, satisfied that the Company, or any successor of it which undertook to furnish adequate facilities to the public of the state, could purchase its materials at the prices actually charged the plaintiff by the Western Electric Company. Mr. Sloan's figures may therefore be ignored. Indeed, it is probable the only importance attached by

the Company to his testimony was the light it threw upon the value to the Company of its connection with the other associated telephone companies and with the American Telephone & Telegraph Company, which owns all the Maryland Company's common stock.

## Present Value of Company's Property— Before Depreciation is Deducted.

Giving all possible weight to the testimony of Mr. Robinson as to present-day cost of its telephone apparatus, equipment, conduits, cables, etc., and not losing sight of the thorough way in which Mr. Gretz prepared his estimates, we do not see that the Company has succeeded in sustaining the burden resting upon it to show that its property today is worth more than it cost in dollars of 1923, plus such allowance as the Commission has made it for the value not recorded on its books, but, nevertheless, present in its well-organized and highly efficient operating concern. On the other hand, the study we have made of the testimony, the exhibits, and arguments has convinced us that the present value of the Company's property, if it were new, differs little, if at all, from the present worth in the monetary units of to-day of the dollars invested in it, whether in money owned or owed, plus, in the same character of dollars, the allowance made years ago by the Commission for the worth of its established business.

We have reached the conclusion we have, not because we suppose that there is, as a rule, any legal reason why proof of the amount invested is to be given greater weight than any other evidence of present value, but simply because, after weighing all the testimony and everything that has been said in argument, and after checking up each suggested method of ascertaining the present worth by every other, we are satisfied in this case that the Company's property on the 31st of December, 1923, was worth as nearly as is possible to ascertain it, the amount invested in it, augmented by the Commission's allowance for intangible value, the investment and allowance both being put in dollars of 1923 by the use of what both sides accept as accurate index figures. We do not wish to be understood as holding that under all, or perhaps under many, circumstances the most accurate valuation can be obtained by the use of such figures. All that we decide is that the evidence of reproduction cost demonstrates that world-wide conditions of which all men have knowledge have greatly increased the appar-

ent value of this Company's property as measured in dollars, and that, from all that has been submitted to us, it so happens that in our best judgment the amount of that increase can be most accurately measured by the use of such figures. It follows that we find that the new or undepreciated value of the Company's property on the 31st of December, 1923, was $36,122,912.

### Depreciation.

[6,7] In so finding, we, of course, do not hold that the Company is entitled to earn a return on that sum. It is true that both sides agree that the Company's property has been kept in first-class condition. Nevertheless all of it has been used for some time. A substantial part has been in service for a decade or more.

The Company admits that some deduction from the new value should be made for depreciation. Its claim, however, is that such depreciation should be determined from the testimony as to the physical condition of the plant, and from that alone, and particularly that it is altogether immaterial what is the amount which is now to the credit of depreciation reserve, although that reserve was built up out of sums taken out of the rates paid by the public and put aside with the consent of the Commission for the sole purpose of making good the ravages of time and chance.

In the Company's depreciation reserve on the 31st of December, 1923, was $6,614,963, as we calculate it. This figure is arrived at by starting, not with the depreciation reserve appearing on the books, but with the $1,367,700 years ago fixed by the Commission, and adding $4,655,154, the net additions to that reserve since. As that reserve has been invested in the Company's property, it has been affected by the same fluctuations in the dollar as has the rest of the Company's investments, so we have taken into consideration the times at which this reserve was actually taken out of rates and credited to the account, and in that manner bring it up, as of December 31, 1923, to the $6,614,963 before stated. Mr. Collins has calculated that the average rate of appreciation in the reserve was 5.7 per cent. We figure it at 9.8 per cent.

### Physical Depreciation.

Mr. Robinson puts the actual physical depreciation of the Company's plant at about $4,250,000. The only testimony the Commission offered on the subject of physical depreciation was with reference to the

Telephone Company's buildings in Baltimore City, and in them it figured the depreciation at about $300,000, more than did the builders whose conclusions Mr. Robinson embodied in his calculations. The figures of the Commission for depreciation in these buildings may perhaps have been a little large; but, on the other hand, we are persuaded, from the actual testimony given by the builders who appraised the buildings outside of Baltimore City and estimated the depreciation in them, that their allowance for it was too low. We therefore find, as a matter of fact, the actual physical depreciation of the Company's property was at least $4,500,000. It may well have been more. We do not think it could have been less. No one questions that, in arriving at the actual present physical value, this $4,500,000 must be substracted from reproduction cost of the property. The controversy is as to whether the remainder of the balance now standing to the credit of depreciation reserve—that is, at the most $2,114,963—should or should not be.

### The Status of Depreciation Reserve Not Apparently Presently Needed.

The Commission answers in the affirmative; the Company in the negative. The latter says that this $2,114,963 belongs to it as completely as does any of the rest of its property. It has found it convenient to put that amount in its plant, but it was under no obligation to do so. It might, if it chose, have kept this sum in cash or in bank, or it might have invested the money in any way its charter would have permitted, and whatever income was thereby earned would have been its to do with as it pleased. In point of fact, it found it convenient to use the fund in the extension of its plant, and it therefore confidently asserts it is as clearly entitled to have that money treated as part of its investment as if it had been raised by the issue of new stock or borrowed upon its bonds or notes of hand.

The argument is strong, and so far as we can see is unanswerable, whenever it becomes absolutely certain that the balance to the credit of depreciation reserve will never be needed for the purpose for which it was originally set aside. In legal theory somebody must own it, and it would seem to be clear that nobody other than the Company does. Upon the assumption just made, it would never be required to make good any impairment in the plant. The Company may do with it as it will, and if it chooses to put or keep it usefully invested in the

public service, the Company is entitled to earn a return upon it.

But is the rule the same so long as it is possible or probable that whatever is to the credit of the reserve will sooner or later be needed for the purpose for which it was originally created? Let us take a simple illustration. Let us suppose that considerable numbers of a particular appliance have long been used by all public utilities furnishing a certain kind of service. Experience has shown that they have an average useful life of 20 years. So long as one of them works at all, it works substantially as well as it did when it first came out of the shop. Until it suddenly breaks down irreparably, it does not show any external or otherwise detectible marks of wear. Let it be assumed that the utility uses 2,000 of these appliances, and that each cost new $100, and can at any time be replaced for that sum; that is to say, that the aggregate value of all of them new is $200,000. Suppose at the end of 10 years $100,000 has been set aside for their depreciation, but up to that time there had been occasion to use for that purpose only $10,000. There would be a balance of $90,000 to the credit of the fund. The appliances still in use would seem to the eye to be as good as new, and yet experience has made it certain that they were not, and that in 10 years more all of them would be on the scrap heap. It would not be possible for any one who knew the facts to say that the articles in use were worth $190,000 because they disclosed no physical deterioration, and that therefore the Company was entitled to a fair return out of rates on their original cost of $190,000 and on the $90,000 in the depreciation reserve as well. The fact, of course, would be that the property was then worth only $100,000, and no purchaser who was familiar with the business would pay more for it. Nor would any essential element of the problem be altered, had the Company, in expanding its business, invested the $90,000 in increasing by 900 the number of appliances it had in use. The new value of all that it had would then be $280,000, but their real worth would be only $190,000, although no one might be able to distinguish one of them put in service yesterday from another which had been in use for a decade.

Now, in substance, what the supposed utility did is precisely what this Company set out to do. The only difference is that, in the case supposed, the average expectation of life of the particular appliance had been definitely ascertained. In the case of as

varied a plant as that with which we are now concerned, it can only be guessed at with a more or less approximate degree of accuracy. Such an estimate the Company has made. Moreover, it has submitted its guess to the Commission, which has agreed that it is a reasonable one. In 1914, and for some time thereafter, the Company thought that to make good depreciation it needed to set aside a trifle over 6 per cent. per annum. A few years ago it reduced the amount to a little over 5 per cent. The history of the reserve has tended, we think, to show that this amount is not likely to prove excessive. On December 31, 1923, the total to the credit of depreciation reserve was only about 19 per cent. of what we have found to be the cost of reproducing new the Company's tangible property. The evidence offered by the Company has failed to convince us that its plant as it stands to-day is worth more than it would cost new, less the amount now to the credit of the depreciation account.

[8] In 1916 the Commission, apparently with the full approval of the Company, allowed it, as the exigencies of its business permitted, to accumulate a depreciation reserve not to exceed 20 per cent. of its capital, and expressly stipulated that such depreciation reserve so set apart should not be included in the capital upon which the Company was entitled to earn a return from rates. We do not hold that there was any agreement between the Commission and the Company in any sense which could be enforced by a court of equity, or that what was done amounted to an estoppel in pais; but we do hold that it is evidence of what both the Commission and the Company felt then was the amount of depreciation reserve which the Company should accumulate if it was to be kept in such a financial condition as would be safe both to its stockholders and to its patrons. We think that that concurrence of view is strong and weighty evidence that a depreciation not in excess of 20 per cent. is not more than may be fairly held to be the average actual depreciation of the plant. As already stated, there is in our view nothing in this record to prove that there was any error in the estimate then agreed upon.

We might well here end the discussion of this part of the case, but it may be worth while to call attention to some difficulties and dangers which would result from the general adoption of the rule for which the Company contends. It would require constant changes in rates. It might well happen that

at a particular time very little depreciation might have manifested itself. According to the Company's theory, it would be entitled to have the unexpended balance accumulated for depreciation included in the total upon which it is entitled to a return, to obtain which a raise in rates might be required. The next year, something might happen which necessitated replacements to an amount equal to or in excess of the sum in the reserve, and then a reduction of rates should follow.

The situation of this Company itself illustrates how unwise it may be to assume that there is any real excess in depreciation reserve. In late years it has rapidly extended its business and has added greatly to its plant and equipment. A much larger proportion of the latter is new than will be the case a few years after the rate of expansion has become less swift. The Company today is very much in the situation in which some of the assessment insurance or beneficial orders were for a number of years after they began business. New members were taken in, in large numbers and at relatively low ages. The average mortality was small, and the assessments low. In the course of time, when recruits no longer bore so large a proportion to the veteran members, it was found that the number of deaths and the amount of assessments rose, often to figures disastrously high. Moreover, if the Company's view prevails, the tendency of Legislatures and Commissions will be to cut depreciation allowances to the bone. As guardians of the public, they will feel that a deduction for depreciation may turn out to be only another name for a credit to undivided profits. Now it is to the real and permanent interest of both public utilities and their patrons that ample allowance shall be made for all those things which tend to make a plant less valuable than it was. It is utterly impossible to forecast all the conditions, all the accidents and all the inventions and other unforeseeable circumstances which may at some time, almost overnight, take all or most of the value out of important units of a utility's property.

To sum up on this part of the case, we hold that from the $36,122,912, which we have found to be the cost of reproducing new the Company's property as it stood on December 31, 1923, the sum of $6,614,963 should be deducted for depreciation, and that the amount upon which the Company was as of that date entitled to be allowed to earn a fair return, if it could, was $29,507,-949. We do not understand that there is

anything the Supreme Court has said on depreciation, in any of the cases in which it has had occasion to consider that subject at all, which is in any wise in conflict with our holding, and we think the implications from the language used by it are in harmony with the result at which we have arrived. We are not certain that upon the facts in this record a different conclusion would have been reached by the statutory courts sitting in the Eastern district of Michigan and in the Southern district of New York in the cases of Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission, 292 F. 139, and New York Telephone Co. v. Prendergast, 300 F. 822; but, if the reverse is true, we can only say that, with the highest respect and consideration for the opinions of the eminent judges who sat in those cases, we must adhere to the views we have expressed.

To What Percentage of Return is the Company Entitled?

[9, 10] The Company says it is entitled to a return which would yield it 8 per cent. on the fair present value of its property used and useful in the service of the public. There is at least one recent opinion from a distinguished court which so holds. New York Telephone Co. v. Prendergast (supra). A history of the present controversy seems, however, to show that the Company makes that contention here principally as a second line of defense, behind which it may shelter itself in the event that the valuation it puts upon its property is too largely reduced. It claims that its plant is worth upwards of $38,000,000, even after allowance has been made for depreciation; 8 per cent. on that sum would be $3,064,000. The rates which it would have put in force, had the Commission permitted it to do so, would, it calculates, yield it a net revenue not much over two-thirds of that sum, or less than 6 per cent. on what it claims to be a fair value of its property. It offered the testimony of several investment bankers of wide experience, high character, and great ability. They agreed that, in order to insure that a public utility of the character of the Company should be able on occasion to get the new capital necessary for a constantly expanding business, it must be able to show earnings of at least 8 per cent. on the money invested. Two of these witnesses based this conclusion on the view that, in order to secure additional investment, the utility must be earning more than it spends or distributes; in other words, that its surplus and undivided profits must steadily increase.

They thought that the minimum sum which should annually be added to these accounts was 2 per cent.

They may be right in their judgment, as to the difficulty of getting people to put their money into a company which is not improving its financial position. We have no reason to suppose that they are not. It may be that the public is even more interested in good service than it is in what that service would cost within reasonable bounds. If so, Legislatures and Commissions may wisely give great weight to the considerations so forcibly urged by these banking witnesses. Nevertheless we take it to be clear that to deny to a utility the opportunity constantly to add to the value of its property out of the rates paid by the public is not confiscation. If the present Company stood alone, either in the sense that it had, unaided, to look after its own financing, or that it did not form what is in reality an integral part of a nation-wide system we might well doubt whether a return of 6 per cent. would be sufficient to enable it to raise the money necessary to its growth, and therefore, it may be, to its life; but such is not the case. It is owned and altogether controlled by the American Telephone & Telegraph Company, hereinafter styled the National Company. In partial return for a substantial annual sum paid by it to the National Company, the latter has agreed to assist it in its financing. According to the table submitted on its behalf, its net earnings have almost always fallen somewhat short of .6 per cent., and yet it has not only lived, but it has been able to raise many millions for the expansion of its facilities and the promotion of its business. It is not for us to pass upon questions of policy. It may well be, as the Commission itself in 1916 thought, that the Company should be permitted to earn as much as 8 per cent., if it could. All that we hold is that, if the Company be allowed as much as 6 per cent., its property has not been confiscated. On the other hand, on this record, we are convinced that an enforced schedule of rates, which would make such minimum earning impossible, is in legal effect to take from the Company its property without just compensation therefor.

### The Company's Net Income.

In 1923, at the rates then prevailing, and which the Commission has ordered shall continue in force until the end of 1926, the Company's net earnings, calculated as they always had been in the past, were $1,382,149, or not quite 4.80 per cent. on the valu-

ation of the Company's property as we have figured it, and 5.67 per cent. on the Commission's value. It is true that the Company's investment was materially increased during the calendar year of 1923, and therefore, if we were dealing with that year alone, it would be necessary to figure the return, not upon the value of the Company's property in use at the end of the year, but on the average of what that value had been throughout the entire year. Under the special circumstances of the case, that is, however, unnecessary, for we have in evidence the net earnings for 12 months ending June 30, 1924—that is, six months before and 6 months after December 31, 1923—and they footed up $1,302,881. For the 12 months ending November 30, 1924, they were $1,347,152, by which last-mentioned date the amount invested had, however, increased $3,805,190. It would appear clear that the rates which the Commission required the Company to maintain for 2 years more will yield it less than 5 per cent., and in view of the considerable additions which in 1924 it has made to the cost and value of its plant, it would seem clear that the return would be quite considerably under 5 per cent.

### The Maryland Company's Relations to the National.

The Commission has, however, concluded that the methods by which the net earnings of the Company, and therefore its return, have been heretofore figured, are inaccurate and unfair to the public. It has reached this conclusion because of certain consequences which it deduces from the relations between the Maryland Company and its owner, the National. To those relations it devotes a half or more of its opinion. In so far as it deals with the figures, the discussion centered principally around two matters; one the so-called license agreement, and the other the apportionment between the two companies of the charges for such part of the interstate telephonic communications as are carried on over the lines of the National Company.

### The License Agreement.

By the license agreement, the Maryland Company, in common, as we understand, with all the other associated telephone companies, which among them cover substantially all the country, agrees to pay the National Company 4½ per cent. of its total gross earnings. In return, the National Company licenses the Maryland Company to use the patents owned and controlled by

it, and all the new and improved apparatus and developments in the art of telephony, resulting from the research and experimental work conducted by or under the direction of the National Company, and it agrees without expense to the Maryland Company to protect and defend it against all patent suits. The National Company undertakes to continue its work of research, investigation, and experiment, not only in the art and science of telephony, but in the development of plans, methods, systems, and ideas designed to promote safety, economy, and efficiency in the equipment, construction, and operation of the Maryland Company's telephone plant. The National Company also undertook to furnish advice and assistance in any financing required to be done by the plaintiff in the extension, development, or improvement of its telephone system within its territory, and agreed to aid in securing funds on fair terms as and when needed by the Maryland Company for new construction. Subscribers of the Maryland Company were given the privilege of using, upon payment of the regular tolls, the connections with the general system of the National Company and its other licensees. The National Company was also to furnish active assistance, co-operation, and support to the Maryland Company in such measures as would best protect and preserve the health and promote the well-being of the Maryland Company's employees, and in other ways to conserve the high quality of service to the Company through the maintenance of a suitable, contented, and efficient personnel and the continued maintenance of the Company's pension, disability, and death benefit system. The National Company bound itself to maintain an organization of specialists, trained in the various branches of the work required to be done by it in rendering the foregoing service, in such numbers and possessing such technical knowledge and experience as would enable the work to be done, so as to relieve the Maryland Company from the necessity of attempting to do it for itself.

The Commission in effect says that, important as are the services which the National Company undertakes to render to the Maryland Company, and in fact does render, they are, after all, nothing more than the things which the National Company, as the absolute owner of the Maryland Company, thinks it good business to do for the profitable maintenance and development of

its own property. Doubtless, in a sense, this is true. The contract between the two companies has been in force continuously since 1902, and indeed in substance from a still earlier date. In all substantial matters, it is identical with the contract which has been many times before commissions and courts, state and federal, and which in the 1914 hearing was said by the Commission of Maryland to be an arrangement of great value to the public of this state.

### Division of Interstate Toll Revenues.

The toll arrangement in force during the time of the hearing before the Commission was one by which the Maryland Company received 25 per cent. of the cash receipts from each single connection, not exceeding 30 cents for each single connection, and twice as much when the business originated at pay stations from which the Maryland Company was entitled to a commission. During the hearing before the Commission a sliding scale of compensation to the Maryland Company had been arranged for, to become operative on the first of January, 1925. Apparently it will make an appreciable increase in the amount retained by the Maryland Company.

The Commission said in its opinion: "Admitting that the local company receives benefits as the result of the license contract, the Commission made diligent efforts to discover definitely in detail how the parent company, in turn, benefited from its relations with the local company, and what was the actual cost to the parent company of the services it renders under that contract." It was the opinion of the Commission, an opinion, as it thought, sustained by the testimony, that while the Maryland Company and the other associated companies pay the entire cost of the service rendered under the license contract, and a very handsome profit on that cost, the benefits derived from the long lines division of the National Company from the service rendered the associated companies are as great as, if not greater, than those received by the associated companies themselves.

In this connection the Commission assumed that, in the case of a public utility, such as the National Company claims to be, and actually is, the cost of rendering a service to another division of that same utility ought to bear some relation to the charge made for the service. When corporations are so closely tied together by stock ownership as are the companies in the Bell Sys-

tem, they are, to all intents and purposes, the Commission said, one company. That was especially true, the Commission thought, when, as in this case, the allied companies form a substantial monopoly of an absolutely essential service, and are, to a very large extent, protected by law or custom in the possession of that monopoly. The Commission said it received no information bearing on this matter which the companies could prevent it from obtaining. It was met, it stated, with the positive refusal of any information relating to the National Company's affairs which was not a matter of public record, or which could not be found in the records of the Maryland Company.

The Commission expressly said that it did not find fault with the unification of the telephone interests in the country in the Bell System; that it recognized the benefits obtained by the people by reason of that unification and by the standardization of services and equipment, by which alone long-distance service particularly is made practical. But the Commission felt that, if the system was to be considered as a whole for the benefit and purpose of its owners, it ought also to be considered as a whole when the subscribers' interests are at stake. It believed that the benefits of the unification ought to be distributed evenly among all parts of the system, as well as the cost of maintaining the system, and the benefits should not be largely absorbed by one branch of the service, while the other parts are burdened with the cost. On long-distance interstate calls the Commission said the Maryland Company owns, maintains, and operates all equipment, does all bookkeeping, collects all revenues, transmits over its lines to the nearest National Company junction point all originating messages, where they are delivered to the National Company's lines. It receives all incoming messages of the National Company's lines and delivers them to Maryland subscribers. For all of this service the Maryland Company received about 15 per cent. of the originating commission.

All of the foregoing and other matters of the same general nature, but of less importance, led the Commission to the conclusion that the fair value of all of the telephone property in Maryland of both companies should be considered as the base for establishing telephone rates in Maryland, especially as the property is actually used as a whole, one part supplemented by the other. The Commission held that, if the rate of return from the whole was adequate and compensatory, it could make no material difference to the owners of the property how the whole was divided. It therefore took as a rate base what it was convinced was the fair value of this entire property; that is to say, it put a valuation, the substantial correctness of which is not, we believe, challenged, upon the value of the National Company's property in the state. It added that to what it found to be the fair value for rate-making purposes of the Maryland Company's property in Maryland, and assumed the total to be the amount upon which a fair return was to be earned. It determined the return which it thought was actually received by adding to the Maryland Company's admitted income all the payments to the National Company for toll messages and $^{22}/_{38}$ of those under the license contract, as well as some other miscellaneous receipts which apparently should not, in any theory, have been included, unless certain offsetting entries were made. In this way it reached the conclusion that the present value of the property in Maryland on which a return was to be earned was $27,801,131, and the net revenue therefrom $2,037,498, or at the rate of 7.3 per cent. The Commission said that, in so far as in these calculations, assumptions, and estimates had been used by it, the responsibility was on the plaintiff, and not upon the Commission.

A third corporation, the American Telephone & Telegraph Company of Baltimore City, a Maryland corporation, was mentioned in the proceedings. All its stock is owned by the National Company. The only purpose served by it is to hold in its name certain toll lines and other property belonging to the National Company in Maryland; it being convenient for condemnation and other purposes that such holder should have a Maryland charter. It does not appear that for present purposes it is necessary to give any consideration to the separate corporate existence of this inactive concern. It is simply a name in which the National Company holds some of its property.

[11] We have not the shadow of doubt, and we find as a fact, that the Maryland Company is completely controlled by the National. It has no independent will of its own. It follows that the dealings between the two, whether in the form of intercorporate contracts or otherwise, are nec-

essarily open to the close scrutiny of courts and commissions.

### Legal Status of License Agreement.

[12] The so-called license contract under which the Maryland Company pays the National 4½ per cent. of its gross revenues is identical in terms with that between the National Company and the Southwestern Bell Company, which figured in Houston v. Southwestern Bell Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961, and in Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, and also with that between the National and the Southern Bell Telephone & Telegraph Company in issue in the case of the last-mentioned corporation against the Railroad Commission of South Carolina. (D. C.) 299 F. 615.

By these cases it is settled that, in the absence of some showing of bad faith, such contracts are binding upon local telephone companies, and must be respected by commissions and courts, provided that the Company clearly shows that the charge made and allowed for the services rendered and supplies furnished was reasonable, and less than that at which the same could be obtained from other sources. Houston v. Southwestern Bell Tel. Co., supra. The evidence on this point offered upon the part of the Company was convincing. Indeed, the Commission has never questioned that, if the National and the Maryland Companies were not under common control, the services rendered by the former to the latter would be well worth all that is charged for them.

What the Commission does claim is that, so far from being independent, the Maryland Company is a mere name under which the National operates a part of its business. To determine what return comes to the real owner of the property standing in the name of the Maryland Company, it is, in its view, necessary to consider all the income which that owner receives from such property, no matter what may be the channel through which it reaches its treasury. Of course, in determining whether such receipts amount to a fair return upon the property used in earning them, it is necessary to bring into the calculations the present actual value, not only of the assets technically belonging to the Maryland Company, but also any others actually employed in performing the services, whether the nominal proprietor of such other property is the National Company or some one of its subsidiaries, other than the Maryland Company. This contention has great force, but cannot be adopted by us, because it has been definitely rejected by the Supreme Court of the United States. Houston v. Southwestern Bell Telephone Co., supra; Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, supra.

### Legal Status of Toll Division Agreements.

[13] Very similar considerations apply to the agreements under which the receipts from interstate business are divided between the two companies. The testimony shows that the interstate business is profitable to the Maryland Company. Indeed, if we understand it correctly, it pays relatively better than does the intrastate business. It is not apparent that the Commission thinks otherwise; at least, we find no clear finding by it to the contrary. What it does say is that, whether the Maryland Company makes or it does not make money out of its interstate business, the National gets from it much more than the worth of any service it renders, and that, before the National can be heard to complain that it is not getting a large enough return from that part of its property which it chooses to put and keep in the name of its Maryland subsidiary, it must account for all the net profit directly accruing to it from its share of the tolls upon interstate business.

The Commission does not question that a system by which every Marylander who has a telephone may, if he will, talk to anybody who is similarly equipped anywhere between the two oceans, is of incalculable value. The Maryland Company could well afford to pay for such widespread facilities all that it does, provided, of course, that what it does pay does not exceed what it gets for its part in maintaining and operating this system of nation-wide communication. As already stated, under the provisions of these contracts, the interstate business of the Maryland Company is profitable. Such being the case, we are unable on principle to distinguish these contracts for the division of toll revenues from the license agreements. If so, the questions raised by the Commission concerning them are also foreclosed by what the Supreme Court has said in the cases already cited.

As has been stated, we agree with the Commission that the Maryland Company is an instrument of the National. If one looks through form to substance, the National owns all the property of the Maryland.

Nobody other than it and its stockholders is interested in the income from the telephone business in this state. The Commission, therefore, naturally feels that it is not possible to determine whether the owner of the property used for the telephone service in Maryland is receiving a fair return on its real value, unless there is taken into the reckoning everything it gets from all its property used in that service. The fact that part of what is really its property stands in the name of one of its instruments and part in that of another, and that some of the income which ultimately comes to it comes through one channel and the balance through another, does not go to the essence of things. Nor to one unlearned in the law would it be altogether clear that the situation is much altered by the fact that the owner and each of its controlled corporations have separate boards of directors, made up in whole or in part of different individuals, every one of whom, however, is named by the same will, and no one of whom retains his directorship longer than that will pleases, or by the other fact that these boards of directors go through the form of making contracts with each other.

### State and Federal Control.

Let it be granted that there is no answer to the contentions so stated. Yet, even so, they deal with only one part of a problem with which we are confronted under our dual system of rate-making. All of us, in Maryland, in Virginia, in Texas, and in California alike, want and need a telephone system operating as a unit throughout the land. Nowhere are the manifold advantages resulting from such a centralized control more forcibly put than in one of the paragraphs of the Commission's opinion in the instant case. There it is said the telephone "system as developed gives the people of this country the best and most economical telephone service in the world and is more universally used than in any other country. About 63 per cent. of all the telephones in the world are located in the United States. There are 13.1 telephones in this country per every 100 population, while in Europe there are only 1.2 telephones per 100 population. The telephone development in this country has been entirely by private concerns, while in Europe the development has been mostly under government ownership. The highest telephone development in any country in Europe, 8.3 telephones per 100 population, is in Den-

mark, where the telephone service is almost entirely operated by private companies."

The experience of the men who built up this system of telephone service, and of those who now manage it, has convinced them that it can best be maintained by uniform arrangements, or substantially uniform arrangements, throughout the country, in the matter of license fees and the division of toll charges. Such uniformity will be impossible, if the reasonableness of the agreements for it are subject to the judgment of 48 distinct commissions, made up of men of varying types of mind and approaching the subject from widely different points of view. Many of them are keenly alive to the desirability of reducing rates within their own jurisdiction, but they are not all of them gifted with sufficient breadth of imagination to put themselves in the place of those living in distant parts of the country. As a practical matter, the regulation of the common business of the National system must be left to the federal government.

The National Company may be getting an unjustifiably large return upon the real value of the property it uses in the public service. Such evidence as was submitted to us tended to show that such was not the case. It, however, all came from the Maryland or the National Company. It did not go very deeply into the subject, and it was not necessarily conclusive. A full and searching inquiry into such matters can in practice scarcely be made otherwise than under the auspices of the federal government. If, as a result of such investigation, it shall be established the National Company is putting undue and unnecessary burdens upon the telephone users of the country, it may be required to reduce its license fees or to permit the local companies to retain a larger percentage of the tolls paid for interstate service. Such a method of dealing with the problem would be more effective than anything which could possibly be done by a state commission or by the commissions of several states. Moreover, if the subject be approached from that standpoint and dealt with in the manner indicated, there will be little or no reason for the federal commission in any wise to limit or interfere with the regulation of intrastate rates by state commissions.

Until the federal authorities act, state commissions and courts reviewing their action cannot, in the absence of some substantial proof of bad faith or of manifest unfairness, go farther than to satisfy them-

selves that the National Company is not charging its local subsidiaries more than the service rendered by it to them is worth. They may not, so the Supreme Court has said, go into an inquiry as to how profitable the business may be to the National Company, or as to what percentage that Company earns upon its property used in the public service. In this case the National Company did, at our request, go to some extent into both questions, and produced witnesses who were apparently informed upon the subject. They gave direct testimony and were open to cross-examination.

The Commission, in its opinion, had commented severely upon the refusal of both the companies to furnish it with information on these matters. In no small part, it based its conclusions upon the presumption it thought it was justified in drawing from such refusal. A large part of the public doubtless adopted this point of view, and have not unlikely gone much farther in the inferences they have drawn from it. Under the circumstances, it seemed to us inexpedient for the National Company to stand on its legal right to refuse the information so much sought after. In compliance with our emphatically worded suggestion, it gave what was asked for while expressly reserving its legal objection to the materiality of this testimony.

[14] The law wisely makes the findings of the Commission presumptively correct. We have differed with them, in so far as we have, with regret, and only because we are compelled to do so by our understanding of the facts and the law. We are fully in accord with its view that the telephone rates should not be raised, unless and until the necessity for so doing is clearly demonstrated. It is the great glory of the privately owned telephone system of this country that the charges at which its facilities have been furnished have, in the past, been such that so large a proportion of our people have been able to make generous use of them. The maintenance of such conditions is of moment to all of us, and not the least to the telephone companies themselves.

It follows, from this too lengthy opinion, that: First, that $36,122,912 was the value new of the Company's property on December 31, 1923; second, that there was in the depreciation reserve on that date the sum expressed in dollars of 1923 of $6,614,963; third, that the difference between these two sums, $29,507,949, is the amount upon which the Company was as of December 31, 1923, entitled to earn a fair return; fourth, that, in view of the relations between the Maryland and the National Companies, the court cannot hold that 6 per cent. was not a fair return; fifth, that anything under 6 per cent. would not be a fair return; sixth, that the Commission was not justified in forcing upon the Company rates which would yield as of December 31, 1923, less than $1,770,477 per annum; seventh, that the Commission, for the purposes of ascertaining the net return to the Company, was not entitled to deduct from the Company's expenditures any part of the sums paid by it to the National Company under the 4½ per cent. license contract or under the agreement for the division of tolls on interstate messages or otherwise; eighth, that the net annual revenue of the Maryland Company was less than $1,400,000 at the time when its property had, as before stated, a fair value for rate-making purposes of $29,507,949; ninth, that the order of the Commission continuing such rates for two years longer was and is confiscatory, within the established legal meaning of that term; tenth, that the Company is entitled to the interlocutory injunction asked for by the second and third prayers of its bill.

We are not a rate-making body. All that we decide is that the Commission may not deny the Company permission to charge rates which will produce at the minimum 6 per cent. on the fair value of its property at the time used, or useful, in telephone service, and that on December 31, 1923, that property was of a value of $29,507,-949. To-day it is, of course, that value plus whatever net additions to it have since been made, diminished, however, by whatever net increase, if any, there has been in the unexpended balance standing to the credit of depreciation reserve.

A decree in accordance with this opinion may be submitted for signature.

NOTE:—Upon the handing down of the above opinion, the Commission held a new hearing and raised the rates fixed by its previous order in such manner as to allow the Company to earn a very slight shade over 6 per cent. upon the value of its property as determined by the court.

The Commission consented to the preliminary injunction being made permanent, which was done by a decree of the court entered on March 20, 1925, and the case was thereby finally closed. There was nothing left open from which either side could appeal.