## NEW YORK TELEPHONE CO. v. PRENDERGAST et al. (CITY OF NEW YORK, Intervener).

District Court, S. D. New York.   November 7, 1929.

See, also, 11 F.(2d) 162.

Albany, N. Y., of counsel), for the Attorney General.

Charles G. Blakeslee, of Binghamton, N. Y. (Melvin L. Krulewitch, of New York City, George E. McVay, of Huguenot Park, N. Y., and Charles E. Murphy, of New York City, of counsel), for defendants Prendergast et al.

Before MANTON and SWAN, Circuit Judges, and CHASE, Circuit Judge (assigned to sit in the District Court), convened pursuant to section 266 of the Judicial Code, U. S. Code of Laws, tit. 28, § 380 (28 USCA § 380).

MANTON, Circuit Judge (after stating the facts as above). The plaintiff is a New York corporation. It owns and operates a telephone property and system throughout the state of New York; also in the town of Greenwich, Conn., and until October 11, 1927, it operated property in the state of New Jersey. Its entire capital stock is held by the American Telephone & Telegraph Company, and it has a practical monopoly of the telephone business in New York state. It thus furnishes both intrastate and interstate toll service. Telephone exchange service is service between telephone stations within the same local service area, and the plaintiff's exchange service in the state is an intrastate service. Telephone toll service is between telephone stations located in different local service areas. The state is divided into a number of local service areas. The telephone exchange service and the intrastate toll service together constituting the whole of the plaintiff's telephone service between points within the state of New York.

The members of the commission are charged with the duty of carrying out and enforcing the provisions of the Public Service Commission Law of the state of New York (Consol. Laws, c. 48) and the orders of the Public Service Commission. The Attorney General is charged with the general powers and duties of enforcing the laws of the state. The orders complained of were made by the commission under the authority of the Public Service Commission Law. Prior to these orders complained of, various regulatory orders were made. The order of January 25, 1923, established new maximum rates for telephone exchange service and made certain changes in rates for so-called "buffer zone" and "interborough toll service" to be charged by the plaintiff from March 1, 1923, for one year and thereafter until further order of the commission. The plaintiff put these rates into effect in the city of New York on March 1,

Charles T. Russell, of New York City (Edward L. Blackman, Charles T. Russell, Edward W. Beattie, Paul H. Burns, and Walton Clark, Jr., all of New York City, of counsel), for plaintiff.

Arthur J. W. Hilly, Corp. Counsel, of New York City (M. Maldwin Fertig, Harry Hertzoff, and Paul Kolisch, all of New York City, of counsel), for intervener.

Hamilton Ward, Atty. Gen. (Thomas F. Fennell, of Elmira, N. Y., Irwin Kurtz, of New York City, and Frederick D. Colson, of

1923, and, except as modified by orders made in this suit by the District Court dated the 1st of May, 1924, and the 15th of August, 1924, they remained in full force and effect until June 1, 1926, when they were superseded by the rates prescribed by the orders of the commission of June 23, 1926. In the cities, towns, and villages in the state of New York outside of the city of New York the rates for telephone, charged by the plaintiff until March 1, 1923, were, with certain minor exceptions, rates which were filed by the plaintiff in the office of the Public Service Commission, as required by law, and they have been continuously, with minor exceptions, in effect since September 1, 1920, until March 1, 1923. In the city of Buffalo, the rates filed and put into effect September 1, 1920, continued in effect until November 1, 1921, when slightly lower rates were prescribed by the order of the Public Service Commission from October 27, 1921, and these lower rates remained in effect in Buffalo since the order became effective up to March 1, 1923. By an order of March 3, 1922, effective April 1, 1922, the Public Service Commission prescribed increased rates for telephone service throughout the state. This order never went into effect, and its enforcement was enjoined by this court, together with the order of the commission of the same date relating specifically to the city of New York, by a temporary restraining order granted March 30, 1922, and by an interlocutory injunction order granted June 12, 1922. This interlocutory injunction was affirmed by the Supreme Court of the United States on April 16, 1923 (Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853). Thereafter the enforcement of the order of the Public Service Commission of March 3, 1922, was enjoined permanently by the decree of this court on May 8, 1923. By an order of January 25, 1923, effective March 1, 1923, which is one of the two orders complained of in the original bill, the Public Service Commission established new maximum rates for telephone exchange service in the so-called "buffer zone," and special toll rates could be charged by the plaintiff throughout the state of New York from March 1, 1923, for one year and thereafter until the further order of the commission. Plaintiff put these rates, thus fixed, into effect, and they have continued in effect by the order of the commission dated May 26, 1926, and such rates are now effective. The orders thus made were designed and intended to restrict the earnings of the plaintiff on its intrastate telephone business so that the annual net returns therefor would not yield a return of more than 7 per cent. upon the rate base which is now claimed to be lower than the fair and reasonable value of the property at the time when the service was rendered. In putting these maximum rates fixed by the orders into effect throughout the state of New York, the plaintiff in no way accepted the terms of the orders. A fair trial was had for more than a year prior to the commencement of this suit, during which time it was demonstrated that the orders did not permit the plaintiff to earn a fair return upon the value of its property, used and useful, in the rendition of its intrastate telephone service in this state.

The plaintiff filed with the Public Service Commission its complaint against these rates, alleging that they were insufficient to yield reasonable compensation for the services rendered by it and they were so inadequate and insufficient as to work a confiscation of its property and to cause the plaintiff continued and irreparable injury. The master has found that the plaintiff diligently prosecuted its complaint before the commission and used all reasonable means to secure relief from the rates fixed by the orders before bringing the present suit, and only after a delay of months it brought the present suit. The preliminary restraining order of this court contained a condition limiting the plaintiff to a surcharge of 10 per cent. upon the rates fixed by the order of the commission for local telephone service in the city of New York and prohibited any surcharge upon the rates fixed by the order of the commission for telephone service in other parts of the state. This temporary restraining order of May 1, 1924, was continued by a preliminary injunction order of August 15, 1924, granting it partial relief, and the plaintiff collected 10 per cent. pursuant thereto from May 1, 1924, to July 1, 1926, when the commission granted the higher rates fixed by the order, which is the subject of attack in the supplemental bill filed. The decision of the commission, which was not unanimous, directed the plaintiff to file with it on June 19, 1926, schedules of proposed rates, charges, and rentals for telephone service in the city of New York in accordance with the majority opinion for the approval of the commission, and further directed that the rates, charges, tolls, and rentals for service in the exchange area of the state of New York outside of the city, fixed and prescribed by the order of the commission on January 25, 1923, complained of in the original bill, should remain in effect and unchanged. Plaintiff protested against these new rates as noncompen-

satory and confiscatory, but, pursuant to the direction of the commission, it filed a proposed schedule of such rates, charges, and rentals for service in the city of New York in accordance with the order. The commission subsequently approved the rates, charges, and rentals set forth in the schedule. The order of the commission required that the rates, charges, and rentals for telephone service fixed and prescribed by the commission's order of January 25, 1923, be continued in effect by the plaintiff without change for the telephone service furnished by it in the cities, towns, and villages of the state of New York, outside of the city of New York, and the order of the commission fixes and prescribes the rates, charges, and rentals to be charged by the plaintiff on and after July 1, 1926, for telephone service in the city of New York, superseding the rates, charges, and rentals fixed and prescribed by the order of the commission of January 25, 1923. Except as thus specifically modified and changed by the orders of the Public Service Commission and the temporary restraining and preliminary injunction orders of this court, the plaintiff's existing rates for intrastate telephone toll service and all other intrastate telephone service within the state of New York have been in effect continuously since July 1, 1921, but in the city of Buffalo, as heretofore stated, decreases in exchange rates were made November 1, 1921, pursuant to the order of the commission of October 27, 1921, and except for a few minor changes, negligible in amount, affecting the charges for telephone service in a few small places.

The plant and property used by the plaintiff, and found to be useful in carrying on the telephone service, consisted generally of land with buildings thereon constructed for telephone uses, central office switchboards and equipment, underground conduits and ducts, underground cables, aerial cables, poles, wires, subscribers' instruments (stations), private branch exchange switchboards (being switchboards on the premises of the subscriber, usually small but sometimes almost equal in size to a central office), and miscellaneous equipment of various kinds, rights of way and easements, working capital, going value, and other property. The record demonstrates that this property was kept in an excellent state of repair and operating condition. From January 1, 1920, to June 1, 1927, it required an annual expenditure of $60,000,000 for new construction.

The preliminary injunction granted (New York Tel. Co. v. Prendergast [D. C.] 300 F. 822) was similar in force and effect to that considered and sustained in Prendergast v. Telephone Co., 262 U. S. 42, 43 S. Ct. 466, 67 L. Ed. 853, where the court held that such an action was maintainable as long as the rates were promulgated, since the commission had final authority in the rate-making process, even though no application had been made for a rehearing, and even though the prescribed rates were but temporary. The bill was held to sufficiently set out the ultimate facts to warrant injunctive relief.

We are solely concerned with the issue whether the master was warranted in his conclusion that the evidence presented proved the claimed confiscation because the rates, charges, and rentals fixed as stated above, failed to yield a fair return for the value of the property, used and useful, in rendering telephone service. This suit in no way interferes with the proper function of the commission, nor does it invade its powers. It tests the claim that the commission's orders exceed the bounds of lawful regulation. Pacific Tel. & Tel. Co. v. Kuykendall, etc., 265 U. S. 196, 44 S. Ct. 553, 68 L. Ed. 975; Oklahoma Natural Gas Co. v. Russell, etc., 261 U. S. 290, 43 S. Ct. 353, 67 L. Ed. 659; Dawson v. Kentucky Distilleries Co., 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638. The burden of proof, of course, is upon the plaintiff to establish the claim of confiscation. United Fuel Gas Co. v. Railroad Commission, 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390.

The master correctly applies these principles, as his guide for ascertaining the fair value of the property, used and useful, in furnishing the regulated service, and finding the net return under the rates fixed by the commission. He found the reproduction cost new, less existing depreciation; also the book cost. Reproduction cost, less actual depreciation, is not the legal equivalent of fair value, as the master stated it to be, for it is, as a matter of law, but evidence of value. St. Louis & O'Fallon R. Co. v. United States, 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Southwestern Bell Tel. Co. v. P. S. Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Water Works & Imp. Co. v. P. S. Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176. The depreciation deducted must be actual. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Georgia Ry. & Power Co. v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Monroe Gaslight & Fuel Co. v. Michigan P. U. Comm. (D. C.) 292 F. 139; New York Tel. Co. v. Prender-

gast (D. C.) 300 F. 822. Reproduction cost, less actual depreciation, is some evidence, the weight of which is to be determined with all the other evidence in the case, as tending to show both the value and the relative importance of all the evidence on the subject. Book costs, with deductions for depreciation, would be an index of present value if there were no fluctuations in the values of land, material, or labor. But there are fluctuations, as this record discloses, and reproduction cost new is an estimate intended to reflect the upward or downward trend in prices or values which have occurred between the date of the actual investment and the date of investigation as to the present value. While the master says he followed the theory of reproduction cost new, less depreciation, or at least gave it controlling weight, nevertheless, the master's results as to present value are correct, except for the modifications which we shall later refer to. Defendants contend that book cost, less depreciation, should be the sole factor considered in the case at bar. This position assumes the other extreme, and is inconsistent with the authoritative decisions.

■ It is the plaintiff's property of which confiscation is asserted. Whatever may be true regarding values generally, reproduction cost, where the owner claims confiscation, can never be more than it would cost the owner to reproduce or replace the property with property equally good. The circumstances in any case may show that, after deducting depreciation, fair value is more than reproduction cost to the owner or less than reproduction cost to the owner. But reproduction cost should always be considered on the basis of what it would cost the owner in a case of confiscation. In determining the reproduction cost new the master took cost to the plaintiff to reproduce, and made allowance accordingly, except in regard to panel type equipment. Since it is the reasonable cost to this plaintiff rather than some unknown and unknowing company which is the guide, there remains to determine whether this element of value was estimated on a reasonable basis which gave due weight to actualities and whether the master correctly found the facts. His assumption was reasonable that the property could be reproduced within the city in six years and the rest of the state within five years. He based this reproduction on this time limitation and found the fair value of plaintiff's property to be:

July 1, 1924................................... $509,671,985
July 1, 1926................................... 604,209,429
July 1, 1928................................... 693,312,092

He found that the extent of the use of plaintiff's property in the state of New York

for 1924, in rendering plaintiff's intrastate telephone service, which was directly affected by the rate orders complained of, as 86.50 per cent. of the total use of the property in both intrastate and interstate business; for 1926 it was 85.75 per cent.; for 1928, 85.55 per cent. Accepting these percentages, which are justified by the record, gives the property, used and useful, in the regulated business as follows:

1924 ................................... $440,866,266
1926 ................................... 518,109,584
1928 ................................... 593,128,494

The net income from the regulated business as found by the master was:

1924 ................................... $ 7,512,104
1926 ................................... 19,870,689
1928 ................................... 25,391,379

These sums, as to revenue, excluded collections under the surcharge allowed pursuant to the preliminary injunction, which were: $3,875,361.57 for 8 months in 1924, $3,524,973.88 for 6 months in 1926. Upon calculation, it will be seen that the rate of return for this invested capital is less than 5 per cent. During the period, as of July 1, 1924, there was:

Property value under construction in the entire state for use in the regulated business of................................... $ 32,000,721
As of July 1, 1926, the entire state...... 6,100,896
The book cost for July 1, 1924, was........ 409,952,934
And as of July 1, 1926...................... 517,646,392

And accepting the percentages of property used in the business, subject to the rates complained of, reduces book costs of said property to:

In 1924 ................................... $354,609,287
In 1926 ................................... 443,881,781

Depreciating this book cost by the amount of observed depreciation, the property subject to the rates complained of was:

In 1924 ................................... $315,756,081
In 1926 ................................... 397,876,061

Or if the proper percentage of the whole balance of the reserve for depreciation is deducted, the book cost, less depreciation, would be:

For 1924 ................................... $270,779,090
For 1926 ................................... 336,994,561

Undoubtedly the present value is greater than the book cost, less depreciation, and, in any event, it is apparent that, on any valuation which may reasonably be found from these figures, the rates are confiscatory.

■ The master found that the price movement generally was upward, but also found that 90 per cent. of the property was purchased or put in service since 1915. He found that the trend in land values was up-

ward, but not very much, except in New York City. This is reflected in the valuation of real estate he accepted for 1926. The effect of the upward trend in prices is properly limited to whether valuations presently made are likely to hold good for a reasonable time in the future. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. We agree with the master that any trend of upward prices, as disclosed from this record, was ineffectual to change the present fair value of the property devoted to the service.

The property used by the plaintiff is well adapted to the business and was established to be worth its cost at the time it was acquired. The master found that the value of plaintiff's property, exclusive of franchises, used and useful in furnishing telephone service and devoted exclusively to the rendition of such service, was substantially in excess of its cost. The book cost for the plant in service and that in progress is not directly comparable with the cost of reproduction new, less depreciation, the master found, because the plaintiff had been financed to a large extent by the American Telephone & Telegraph Company by the purchase of its common stock at par, and it had not therefore incurred the commercial expense for the cost of financing, bankers' checking engineers, etc., which would be incurred if the plaintiff's plant was reproduced in the future or had been reproduced in the past under ordinary circumstances. Moreover, he found that expenditures associated with construction had been carried on the books as capital items, and had also been charged as annual expenditures, and, although the cost thereof had actually been incurred and paid by the company, the amount paid was not reflected in the book cost of the company's plant. These items were taxes, fire insurance, and casualty insurance during construction. Other expenditures relating to construction, which are now charged on the books to construction in whole or in part, were not always so treated. These were general executive costs and interest during construction, no charge having been made to capital or construction for either of these items prior to 1918. Expenditures relating in part to construction and in part to operation, he found allocated in too small a percentage to construction. These items included the general expense subsequent to 1918, of interest during construction subsequent to that year, in each of which items the portion allocated to construction was less than one-half of the portion taken in the reproduction

cost new figures. Moreover, he found that items such as preliminary organization and legal costs were not reflected in the book costs, and, by reason thereof, he found that the plaintiff understated the true cost of its property in its book costs. This, together with the unquestioned increase in value of the property, justified his refusal to accept a book cost as contended for by the defendants. It required a higher valuation and gave justification for the weight given to the reproduction cost new, less depreciation.

In Southwestern Bell Tel. Co. v. P. S. Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, the Supreme Court reaffirmed the rule announced in Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 S. Ct. 192, 195, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, where the court said: "There must be a fair return upon the reasonable value of the property at the time it is being used for the public. * * * And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase."

In the Minnesota Rate Cases, 230 U. S. 454, 33 S. Ct. 729, 762, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court said: "The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

In Southwestern Bell Tel. Co. v. P. S. Comm., supra, at pages 288, 289 of 262 U. S., 43 S. Ct. 544, 546, 67 L. Ed. 981, 31 A. L. R. 807, the court said: "An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of to-day. * * * It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership."

The Supreme Court again recently reiterated the consideration or weight to be accorded to current or reproduction costs in as-

certaining value, and said that present cost along with all other pertinent facts must be considered. St. Louis & O'Fallon R. R. Co. v. United States, 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798; Georgia R. R. & Power Co. v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

Both plaintiff and defendants complain of the master's findings as to certain items which we shall now consider.

### Upward Trend of Prices.

The plaintiff charges that the master erred in refusing to find higher valuations because of the upward trend in the prices of both labor and materials entering into the reproduction of the plant. Having found the values at figures which agreed with the cost of reproduction new, less depreciation, the master included nothing for upward trend which he found to exist. No such trend in prices was shown to justify the consideration thereof now urged by the plaintiff. Due regard for upward trend of prices is reflected in the valuations made by the master.

### Land and Buildings.

The defendants complain that the book figures as to the land and buildings, less depreciation, are the maximum value which the master should have allowed in their valuation. The argument proceeds that the inseparable character of the land and buildings, as shown by the testimony of the witnesses for the plaintiff, demonstrates that an increase in the value of the land usually causes a decrease in the value of the buildings. That is, when the land increases in value, the building, which may have been entirely suited for the land when it was constructed, becomes unsuited to the land and interferes with the most advantageous use which is the cause of the great increase in land value. The plaintiff's witnesses testified to the land values and then to the value of the cost of reproducing the buildings, and it argues that the sum of the two is the value of the property. The defendants argue that the plaintiff failed to treat them as a unit. It is clear to us that the master endeavored to find the market value. It was reasonable to assume that land would have to be acquired first and then suitable buildings placed thereon in the course of reproduction. It is improbable that the land and buildings could be acquired as a unit. The evidence satisfactorily shows that the amount and kind of property on hand was correctly found, as was its replacement cost. That which was deducted for accrued depreciation was justified. Reproduction cost as applied to the land, of necessity, refers to

market value. The reproduction cost of the building must be added to the land. The master's valuation of both is not excessive.

### Equipment.

The plaintiff's evidence showed complete inventories or spot checks of its entire plant and equipment. Books and records were kept in a uniform system of accounts for telephone companies as prescribed by the Interstate Commerce Commission and also adopted by the State Public Service Commission. No real issue is presented as to any quantity item claimed by the plaintiff. The record completely sets forth the manual central office equipment and associated power plant, the panel type machine, switching central office equipment, the step by step type machine, and the entire plant in the state of New York outside the city of New York, both toll and exchange; the outside plant in New York City, toll and exchange; station equipment outside of New York City and station equipment in New York City; the rights of way and general equipment. The proofs of prices were uncontradicted in most instances. Indeed, there was little contradiction of the reproduction costs by the defendants with respect to the parcels of land and the buildings in the city of New York (which constitute more than 92 per cent. of this total class of property); underground conduits, both main and subsidiary; underground cables, both main and subsidiary; aerial cables, pole lines, together with the copper wires thereon; station apparatus and installations; furniture, fixtures, and automobiles.

### Inexperience Factor.

The valuations made of some items, however, are questioned. The central office equipment as of July 1, 1926, had a book cost of $170,300,786, and a reconstruction cost of $171,200,355. This was, in a very large measure, purchased from the Western Electric Company, a subsidiary of the American Telephone & Telegraph Company. The panel type was manufactured and sold exclusively by the Western Electric Company. The master, in arriving at a cost of reproduction, considered an imaginary manufacturer of panel type equipment other than the Western Electric Company, and in his calculations made allowance for an "inexperience factor" and said:

"The manufacturer's costs of the Western Electric Company as of July 1, 1926, were $13,880,724. To this was added $4,305,504 as necessary to bring it up to the amount that any outside inexperienced manufacturer would have to incur in doing the same work.

"The installation costs of the Western Electric Company as of July 1, 1926, were $7,542,867. To this was added $11,766,873 as necessary to bring it up to the amount that any outside inexperienced manufacturer would have to incur in doing the same work.

"The manufacturer's specification and drawing costs for the Western Electric Company as of July 1, 1926, was $1,118,503. To this was added $1,319,837 as necessary to bring it up to the amount that any outside inexperienced manufacturer would have to incur in doing the same work.

"That is to say, on July 1, 1926, the Western Electric Company could do this work for $17,392,214 less than an outside inexperienced manufacturer."

And he included this amount in the reproduction cost new on the theory that, while the New York Telephone Company was reconstructing its plant, it did not own the Western Electric Company, and therefore it was proper to figure on what it would cost an outside manufacturer. This apparatus is manufactured under patents, and no other manufacturer, unless licensed, can make it. This plaintiff, whose property necessarily would have to be reproduced on the theory of reproduction cost new, could reproduce the panel type equipment by purchase from the Western Electric Company. Its ability to do so is part of its going value. The master's finding of reproduction cost for this item should be deducted from 1926, that is to say, the item of $17,392,214, for the so-called "inexperience factor." What was charged the plaintiff we must assume the Western Electric Company would charge if the property were to be reproduced. To assume otherwise would be fanciful.

There is a claim of excess panel type equipment, and a deduction was made, by the master, of 16 per cent. for this item. This is unsatisfactory to both parties, but a careful examination of the record justifies that deduction.

### Profits of Western Electric Company.

■ Complaint is made of the profits of the Western Electric Company. It sold the plaintiff large quantities of material which it does not manufacture, but which it buys in the open market, thus saving the cost of storage and the expense of a purchasing force, and it kept on hand a large supply for plaintiff to meet its demands, thus insuring prompt service. Purchasing in large quantities resulted in reduction of prices. Some of the apparatus was manufactured under patents held by the Western Electric Company and sold to the Bell system of telephone companies. The Western Electric Company's profits are established to be small commensurately speaking. The Public Service Commission carefully examined into these supply contracts and approved them, and the evidence in the record justifies that approval. The evidence showed that the Western Electric Company made a profit of 6.4 per cent. on telephone apparatus which it sold to the associate companies. The books of the Western Electric Company were audited by public accountants of good reputation. The fact is that the Western Electric Company was able to sell, and did sell, cheaper. The defendants' evidence on this subject was restricted to shop costs with selling prices on some certain articles. The question presented is what it reasonably costs, under ordinary circumstances, to obtain an amount of equipment equal to that in the plant and service of the plaintiff. Such material might be obtained from the Western Electric Company or some other manufacturer of telephone apparatus. In the case of the Western Electric Company, it was entitled to a reasonable manufacturing cost, plus a fair profit. This is what the plaintiff established. The plaintiff paid the Western Electric Company for panel type equipment apparatus $58,494,357; the reasonable price thereof, allowing for a profit to it, was upwards of $66,973,322, and the plaintiff argues that it should have the benefit of this difference in ascertaining reproduction costs. The master properly rejected the claims of a lower manufacturing cost. The prices were established to be fair, and these costs should be used in finding present value, less depreciation. This purchasing from the Western Electric Company has unquestionably resulted in many reductions in cost to it as well as better service and supply.

■ ■ Nor can the defendants maintain that the reproducer must be assumed to have at hand all the money, ability, and experience required, and that no value may be placed on these. As applied to this case, the reproduction cost means cost to the owner under the conditions which may reasonably be expected to exist if the property were to be replaced. Since it is the claim in rate cases that the owner's property is being confiscated, whatever may be the facts regarding value generally, reproduction cost, where an owner claims confiscation, can never be more than it would cost the same owner to reproduce or replace with property equally as good.

### Promotion Expenses.

The plaintiff complains of the disallowance of $18,000,000 for promotion expenses. The master held that item to be too improbable, and disallowed it, and also disallowed, in part, claims, as made by the plaintiff, for preliminary organization, legal costs, banks' checking engineers, costs, etc. Recognizing that, where property is to be reconstructed, these costs would be incurred (Ohio Utilities Co. v. Public Utility Comm., 267 U. S. 362, 45 S. Ct. 259, 69 L. Ed. 656; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244), he found the estimates of the plaintiff too high. His allowance of $3,456,000 for preliminary organization and legal fees will be allowed, which includes the sum of $584,000 allowed for permits for underground construction.

### Going Concern.

The master found that the plaintiff was entitled to the valuation as a going concern of $26,000,000 in the city of New York and $9,000,000 outside of the city. While the plaintiff is well managed and has built up a large business with a trained force of employees, who are found capable and expeditious in the discharge of its service to the public, still the allowance by the master was excessive. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192; New York Tel. Co. v. Prendergast (D. C.) 300 F. 822.

The commission, after the decision granting the injunction pendente lite by this court, allowed $10,000,000 for going value— $7,500,000 in the city of New York, and $2,500,000 outside the city. Some items which the master considered, we think improperly, led him to these conclusions. Plaintiff's claim, which the master considered, that $19,000,000 was required to train its force of employees to their present efficiency, had previously been treated as a cost of operation. That treatment was proper. It proved $5,500,000 for developing records, files, etc., and $4,000,000 for record of subscribers and directories. These expenses were charged up to operating costs. They may not be charged both as expense of operation and as an acquisition of capital. $9,500,000 was considered as the hypothetical cost of advertising and canvassing to get subscribers. This was a cost for creating good will and a regulated utility cannot estimate good will into its rate base. Galveston Elec.

Co. v. Galveston, 258 U. S. 388, 396, 42 S. Ct. 351, 66 L. Ed. 678. The claim of $9,500,000, consisting of items for maintenance, depreciation, interest, and taxes between completion of the hypothetically reconstructed plant and the time when it would be running at normal operating capacity, was found by the master to be too speculative. The allowance made by the commission for going concern value was soundly based, and therefore we modify the amount allowed by the master to $10,000,000.

### Financing Costs.

The American Telephone & Telegraph Company provided all the capital for the plaintiff and held all its capital stock. An allowance of $22,943,000 was made for the cost of financing. This hypothetical reconstruction cost will be disallowed. In Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 397, 42 S. Ct. 351, 355, 66 L. Ed. 678, the court said: "But as the base value considered is the present value, that value must be measured by money; and the customary cost of obtaining the money is immaterial." See, also, Reno Power, etc., Co. v. P. S. Comm. (D. C.) 298 F. 790; City of Winona v. Wisconsin-Minn. Light & Power Co. (D. C.) 276 F. 996; City of Minneapolis v. Rand (C. C. A.) 285 F. 818. The item of bankers' checking engineers of $2,207,000 and interest on preliminary costs of $2,554,763 will be disallowed. These are costs of establishing the business as referred to in Southwestern Bell Tel. Co. v. P. S. Comm., 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807.

### Working Capital.

The allowance for necessary working capital found by the master was: As of June 1, 1924, for the city of New York—$10,920,000; for the entire state—$14,040,000. As of July 1, 1926, for the city—$12,480,000; for the entire state—$15,964,000. The plaintiff claims it should have a larger allowance and refers to its books to show the figures. The plaintiff is entitled to have an adequate working capital to provide promptly for the materials and supplies, current maintenance and repairs chargeable to operating expenses, and other contingencies so as to permit the company to carry on its operation as a going concern without delay or extra expense. Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192, affirmed Ottinger v. Kings County Lighting Co., 272 U. S. 579, 47 S. Ct. 199, 71 L. Ed. 421; New York & Q. Co. Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351. The master found, from the

evidence, that the plaintiff's allowance therefor was too liberal. We will not disturb that finding. There can be confiscation only of the necessary working capital needed to render the service. Board of Public Utility Com'rs v. N. Y. Tel. Co., 271 U. S. 238, 46 S. Ct. 363, 70 L. Ed. 808.

### Work Under Construction.

The rate fixed must be reasonable and just as to the present and also for a reasonable time in the future. Therefore, the fair value of work under construction must be included as well as that presently used. The master's findings as to this item for the state and city are reasonable. They were properly included in the valuation of the property found to be used and useful in the service rendered and to be rendered. It is for the same reason that the trend upwards or downwards in prices is a consideration. Its effect is properly limited to whether valuations presently made are likely to hold good for a reasonable time in the future. The master ruled that the price movement was generally somewhat upward, but very little, except in land values in New York City. He concluded, however, very properly, that the trend in prices should not be given any effect as an increase in the fair valuation of property used in the service.

### Depreciation.

In finding depreciation to be deductible from both the reproduction cost and the book value, the master correctly stated the rule to be that the sum to be deducted must be the actual depreciation. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075. Two factors were considered by him: (1) actual depreciation as given by testimony of experts who examined the major part of the property and (2) reserve depreciation as set up by the plaintiff. The plaintiff deducted from gross earnings in each year since 1923 approximately 5 per cent. of the cost of its depreciable property, consisting briefly of buildings, central office equipment, overhead plant, and underground plant and station equipment. The commission approved this percentage for reserve depreciation. The plaintiff argues that this annual charge is merely a bookkeeping entry called an annual expense for depreciation and expenses; that after it had deducted from its gross revenues for the year the moneys which it had to expend for operation and maintenance, including taxes, it had a balance left, and from this balance it made a further deduction by a book entry which it calls annual expense of depreciation. This estimate and deduction is set aside annually in recognition of the fact that various portions of the property have not indefinite lives but must be retired from service at some time and are subject to various hazards, and the argument proceeds that these estimates are recognition of the fact that provision must be made annually to meet the losses occasioned by such retirements when they shall occur. These reductions reduce the amount of profit otherwise realized. Such business foresight has been approved. Board of Public Utilities Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808; Knoxville v. Water Co., 212 U. S. 1, 13, 29 S. Ct. 148, 53 L. Ed. 371. Adequate provision must be made each year to meet the year's share of losses to be supplied at the time of retirement, because inadequate provision in the past does not justify an increase in the future provision. Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678. The Interstate Commerce Commission and the Public Service Commission both instructed the plaintiff to provide for the retirement of its property by making a pro rata provision in each year during the expected life thereof, the sum of which amounts, at the time of retirement of the property, to the original cost less salvage. These yearly provisions are made by deducting the revenue each year at a fixed percentage of the cost of each class of property. The master found the proper future rate to provide for the plaintiff's property retirement as 5.1 per cent. This was in accord with the Public Service Commission's finding, and this court, in granting the preliminary injunction, stated that it was a proper annual charge "to provide means, not only of covering deterioration from use and time, but of minimizing, and only minimizing, future possible losses of any kind, from storm or fire to changes of fashion." New York Tel. Co. v. Prendergast (D. C.) 300 F. 822, 824. The plaintiff argues that, unless and until the expected loss is incurred, there will be a steadily increasing amount in the depreciation reserve, and that such proved to be the fact in its experience; that such reserve was invested in the plaintiff's property and the master has allowed such item so invested to be considered in the rate base. On July 1, 1926, the plaintiff had $125,000,000 in its depreciation reserve. The master found that the actual depreciation which had already taken place in plaintiff's

plant was $53,647,819, making a difference of $71,000,000. While the figures are not available in the record, it is argued that it was much greater in 1928. Contrary to the plaintiff's argument, this difference does not show that there was an overestimate of the annual charges for depreciation. The actual existing depreciation must show the losses which have taken place. The burden of showing actual depreciation is with the plaintiff. While fair present value cannot be determined with the certainty and accuracy of original cost, it must necessarily rest upon opinions and estimates. But when developed upon a reasonable basis by competent and upright witnesses, the fact finder has as accurate data on the subject as can be hoped for. Therefore, the necessity for finding essential facts creates the necessity for using not what evidence might be desired, but the best of which the subject admits. Either the property has in fact depreciated to the extent of the depreciation reserve which has been created, or it has not. If it has not, the plaintiff has been allowed to take money from its rate payers under the claim of depreciation which was not there, either seen or unseen, and which it will never have to admit. In that case, the excess reserve has been acquired unlawfully and is the property of the plaintiff. But if the actual depreciation exists to the extent that the plaintiff has claimed in building up this reserve, it exists as much for valuation purposes as it did for the creation of the surplus. Whether or not the plaintiff admits the depreciation now, or must do so in the future, is unimportant, for it is there, and the time of its admission is immaterial on the question of its existence. If, as claimed by the plaintiff, sound honest business methods have been followed and the straight line method pursued by it was not excessive, the depreciation reserve, when added to the property now or at any time, would be no more than sufficient to keep the actual value of the property constant. The record satisfactorily shows that there is more reason to believe that the actual existing depreciation in the plaintiff's property is reflected by the amount of its reserve for depreciation than that it is shown by the estimate of experts who stated observed depreciation, which sum only was deducted by the master. For these reasons, the plaintiff has failed in the burden, resting upon it, to prove that the reserve depreciation was greater than the actual depreciation, both seen and unseen, as measured by the depreciation reserve.

In New York Telephone Co. v. Prendergast, 300 F. 822, 825, this court said: "To deduct from the fair value of plaintiff's property the entire book reserve for depreciation, in order to reach a rate base, was error of law. In point of fact the property had not depreciated that much; the commission did not find any such depreciation."

Before the master, the plaintiff was permitted to show actual depreciation which might justify its claim made at the hearing for the preliminary injunction. But now, with the burden upon it to establish what its property was worth as the reproduction cost, less actual though not realized depreciation, it has failed to meet that burden. When it built up its reserve, it claimed the reserve as its actual depreciation. It cannot now take an inconsistent position about depreciation, without fully establishing it, and it has weakened its proof of present value accordingly. The plaintiff was right about depreciation when it created its reserve, and it is wrong, in its position now, in its claim for a lesser sum as actual depreciation in this effort to establish fair value. Railroad Commission v. Cumberland T. & T. Co., 212 U. S. 414, 29 S. Ct. 357, 53 L. Ed. 577; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Chesapeake & Potomac Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938; Idaho Power Co. v. Thompson (D. C.) 19 F.(2d) 565. The reserve depreciation must be divided by that percentage of the whole of the property which is devoted to intrastate service.

### Earnings.

The master found, as warranted by the evidence, that the entire revenue for the State of New York, excluding the surcharge collected under the preliminary injunction order, was in—

| | |
|---|---|
| 1924 | $115,009,305 |
| 1926 | 150,574,433 |
| 1928 | 180,386,569 |

After the master had deducted 2 per cent. on construction work in progress for each of the years. The operating expenses were $103,933,914 in 1924; $126,400,603 in 1926; $148,295,904 in 1928.

The defendants complain that these figures are excessive (a) because the amount deducted for the reserves for depreciation is excessive and should be reduced; (b) that the amount paid to the American Telephone & Telegraph Company under its license contract was excessive, and that nothing should be taken out of the income to meet this expense; (c) that the plaintiff was not taking full advantage of the savings in "straight-

forward trunking," "restricted repetition," and improvements in the art of telephony; (d) that a deduction for rate case expenses should be made; and (e) that an insufficient deduction was made by the master for taxes, maintenance, and depreciation for 1926.

As to (a), the defendants by their evidence attempt to show that the plaintiff, over a series of years, was creating excessive reserves for depreciations, and that these were still accumulating. There was evidence of experts both ways on this question. The master accepted the testimony of the plaintiff and approved the rate of depreciation thus established, holding that the amount set aside was not excessive. For the reasons we have stated, we think the conclusion of the master the correct one.

As to (b), the plaintiff paid commissions to the American Telephone & Telegraph Company under a license contract. It paid a certain percentage of the gross receipts for services rendered to it by the American Telephone & Telegraph Company; in 1924–1925, 4½ per cent.; 1926, 4 per cent. and 1928, 2 per cent. of the gross receipts. These services consisted of patent protection, legal, commercial accounting, traffic engineering, operating assistance, advice, and telephonic connections with other companies in the Bell system. The contract was made in good faith and carried out. It cannot be seriously questioned but that this was all beneficial to the plaintiff. Such assistance made possible the efficient service rendered by the plaintiff. The contract was investigated by the Public Service Commission and won approval. It is an enforceable contract. Denney, etc., v. Pac. Tel. & Tel. Co., 276 U. S. 97, 48 S. Ct. 223, 72 L. Ed. 483; State of Mo. ex rel. Southwestern Bell Tel. Co. v. Public Service Commission of Missouri, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; City of Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Indiana Bell Tel. Co. v. Public Service Commission (D. C.) 300 F. 190. The payments under it were operating expenses.

As to (c), the defendant Public Service Commission argues that the plaintiff was not taking full advantage of the "straightforward trunking," "restricted repetition," and improvements in the art of telephony. The burden of this argument is that the plaintiff failed in introducing these improvements and thus reducing the cost of the expense of operation, but the witnesses' testimony indicates that these savings should be gradual. In furnishing efficient service, in the absence of bad faith or fraud, it was proper for the master to assume that the company took advantage of any and all savings from "straightforward trunking." The plaintiff was under the burden, when operating its plant, of acting in good faith, and, when it did so, was entitled to constitutional protection. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Northwestern Bell Tel. Co. v. Spillman (D. C.) 6 F.(2d) 663. During the years in question, the record establishes that the plaintiff practiced all savings and economies available from "straightforward trunking," and the use of other known improvements.

As to (d), the rate expenses, which were charged to operating, were not abnormal but an annual recurring expense to the plaintiff. They were properly charged to operating expense.

As to (e), the master deducted $1,100,000 as the approximate amount of this expense. We agree with him as to this item.

The claim of the plaintiff to "reasonable value" for service rather than what it actually paid under the contract for service with the American Telephone & Telegraph Company is disallowed.

The rate of return should be fair, for anything else, which fails to yield the plaintiff a reasonable profit on its invested capital, is confiscatory. Generally such rate, of course, depends upon the kind of business, its location, inherent hazards, and other such elements. The net returns of the plaintiff from its entire telephone operations in the state of New York under the rates complained of here were found to be as follows:

1924 .............................................. $11,075,391
1926 .............................................. 24,173,830
1928 .............................................. 32,090,665

This excluded the amounts collected as surcharge under the preliminary injunction orders. Considering only the net revenues received by the plaintiff from its intrastate telephone operations in the state of New York, directly affected by the rate orders of the commission or in other words the regulated business, the amounts are as follows:

1924 .............................................. $ 7,512,104
1926 .............................................. 19,870,689
1928 .............................................. 25,391,379

The plaintiff's property in the State of New York is used to render (a) interstate toll service; (b) intrastate toll service a part of which is affected by the rates fixed by the commission and part of which is not so affected; (c) exchange service, all of which is

intrastate and affected by the order in question.

■ The net revenue received by the plaintiff from its intrastate telephone service in the state of New York directly affected by the rate orders here in question, he found to be determined by taking 84.97 per cent. of his total revenues for 1924; 82.25 per cent. for 1926; 82.79 per cent. for 1928, and deducting therefrom 86.78 per cent. of the total expenditures for 1924; 83.91 per cent. for 1926; and 83.58 per cent. for 1928. The evidence justifies accepting these percentages. The separation of the plaintiff's interstate telephonic business from intrastate is a difficult problem which the courts recognize and do not require exactness of proof. Groesbeck v. Duluth So. S. & A. Ry. Co., 250 U. S. 607, 40 S. Ct. 38, 63 L. Ed. 1167; Rowland v. Boyle, 244 U. S. 106, 37 S. Ct. 577, 61 L. Ed. 1022.

The master has taken these percentages and arrived at the fair present value of the plaintiff's property throughout the state, used and useful, in furnishing intrastate business as follows:

July 1, 1924
In service ................................... $408,865,545
Under construction ....................... 32,000,721

Total ..................................... $440,866,266

July 1, 1926
In service ................................... $512,008,688
Under construction ....................... 6,100,896

Total ..................................... $518,109,584

July 1, 1928
In service ................................... $585,463,909
Under construction ....................... 7,664,585

Total ..................................... $593,128,494

From these amounts we deduct the items for over allowance for—

Inexperience factor (84 per cent.)...... $14,609,459 76
Going value .............................. 25,000,000 00
Cost of financing......................... 22,943,109 00
Bankers checking engineers $2,207,000 00
Interest on preliminary
cost ........................... 2,554,763 00
Including same charges
(85.75 per cent.) for con-
struction work in prog-
ress ...................... 256,087 23

$5,017,850 23
Less deduction by master
of these two items........ 1,500,000 00    3,517,850 23

$66,070,418 99
And finding 85.75 per cent. thereof is... $ 56,658,384 88
To which must be added 85.75 per cent.
of the sum of the difference between
the reserve depreciation and the al-
leged actual depreciation allowed by
the master ........................... 60,882,500 00

Making a total of........................ $117,537,884 28
Which must be deducted from the pres-
ent fair value as of July 1, 1926, and
leaves that valuation at.............. $400,571,699 72
As of 1928 it amounts to................. $475,390,609 72

The surcharge of 10 per cent. upon the local rates in the city of New York fixed prior to the last order of the commission and collected were as follows:

1928 (8 months).............................. $3,875,361 57
1925 (entire year).......................... 6,483,546 24
1926 (6 months)............................ 3,524,973 88

Pursuant to the terms of the temporary restraining and preliminary injunction orders, this surcharge was collected. The plaintiff is entitled to retain these moneys, since the rate at the time was confiscatory and did not yield an adequate return. And the surcharge so collected did not relieve plaintiff from the confiscation being daily imposed. Including the surcharge moneys thus received and having regard for the valuations as we conclude in modification of the master's findings, the return shows an inadequate percentage upon the money invested in the property, used and useful, in the telephone service. If the orders fixing these rates are enforced and the plaintiff thereby compelled to charge the rates, charges, and rentals therein fixed and prescribed, and if the plaintiff practiced all reasonable economies consistent with rendering adequate and efficient service to the public it would be prevented from earning a fair return or a nonconfiscatory rate on the fair and reasonable value of its telephone property, used and useful, and devoted to furnishing intrastate telephone service in the state.

■ Accepting these deductions and considering the income as found by the master and stated above, the rate of return on the present fair value as of July 1, 1926, would be less than 6 per cent.; as of July 1, 1928, less than 6 per cent. Such returns are below the customary rate allowed to public utilities at this time by the courts. McCardle v. Ind. Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Brooklyn Borough Gas Co. v. Prendergast (D. C.) 16 F.(2d) 615; Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192, affirmed Ottinger v. Kings County Lighting Co., 272 U. S. 579, 47 S. Ct. 199, 71 L. Ed. 421; New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F.(2d) 167. The claim of confiscation and violation of the Fourteenth Amendment is therefore established.

■ This plaintiff is free of competition and has enjoyed an ever-increasing volume of business in a rapidly growing population. The number of telephone users and their use of telephone service, as disclosed by this record, has greatly increased. This monopoly of communication service affords a fruitful field for investment and makes secure in-

vestors. Capital's invitation is alluring, and this corporation experienced no difficulty in securing its capital requirements. Indeed, the American Telephone & Telegraph Company, owner of all the capital stock, cared for all such requirements. A 7 per cent. return will amply assure capital and reward investors. Gas and electric light utilities referred to in the cases above, where returns up to 8 per cent. were thought not to be high, have no such monopoly and freedom from competition as does this plaintiff. The public service of supplying gas and electricity within the same locality are more or less competitive, but the use of the telephone has won its way into the every day necessity of life and has thus won so strong a position that there is certainty of no cessation of its use but, on the contrary, every indication points to greater use. These facts lead us to the conclusion that a greater rate of return allowed would be unjustified.

The defendants have moved to refer the proceeding back to the master to make separate findings as to the confiscatory effect of the rates for New York City and rates outside of the city. The court is not engaged in the task of rate fixing. The question is one of confiscation, that is, whether the plaintiff is able to earn a fair return on a fair value of its property devoted to its entire intrastate business. The master has properly considered the rates as a whole and found the values as to the property devoted to intrastate service within the state. He separately found the values for the city of New York and outside the city for the rest of the state. No good or lawful reason is advanced why there should be separate findings as to the effect of the city rates and outside the city rates respectively; our concern is whether all the rates imposed by the commission are remunerative or confiscatory, and we leave to the commission the readjustment of the rates upon our finding that it is confiscatory. Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; Northern Pac. Ry. v. No. Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Love v. Atch. T. & S. F. Ry. Co. (C. C. A.) 185 F. 321.

The plaintiff should have the relief it seeks, and, until the commission shall have fixed the rate consistent with this opinion, the plaintiff may have injunctive relief and an increase of its charges to be provided for in the order to be submitted.

The report of the master, as modified, is confirmed.